**ALLEGHANY CORPORATION, Plaintiff,**

v.

**Robert D. HAASE, Commissioner of Insurance of the State of Wisconsin, Defendant.**

No. 88–C–368–C.

United States District Court, W.D. Wisconsin.

March 7, 1989.

Jeffrey B. Bartell, Donald K. Schott, William J. Toman, Erica M. Eisinger, Quarles & Brady, Madison, Wis., Thomas W. Tinkham, Richard L. Bond, David R. Abrams, Dorsey & Whitney, Minneapolis, Minn., for plaintiff.

Peter L. Gardon, Whyte & Hirschboeck, Madison, Wis., for intervenor St. Paul Fire & Cas. Ins. Co. and St. Paul Companies, Inc.

Daniel D. Stier, Asst. Atty. Gen., Madison, Wis., for defendant.

James A. Strain, Peter J. Rusthoven, Barnes & Thornburg, Indianapolis, Ind., for American Council of Life Ins. American Ins. Ass'n, amici curiae.

## ORDER AND OPINION

CRABB, Chief Judge.

Plaintiff brings this action for declaratory judgment seeking a determination that Wis.Stat. §§ 611.72 and 617.12 violate the Commerce Clause, the Supremacy Clause, and the Fifth and Fourteenth Amendments of the United States Constitution, and Title 42, Section 1983 of the United States Code, and for injunctive relief to prohibit defendant from enforcing those sections of the Wisconsin statutes. Those sections prohibit the execution of any plan for the acquisition of control (as defined in Wis.Stat. § 600.03(13)) of any domestic stock insurance company, or its parent holding company wherever organized, without the approval of defendant.

Plaintiff, a Delaware corporation with its principal executive office in New York, owns approximately 9.2 percent of the outstanding common stock of the St. Paul Companies, Inc., a publicly-traded insurance holding company domiciled in Minnesota. Plaintiff seeks to acquire presumptive control (in excess of ten percent of the common stock, Wis.Stat. § 600.03(13))) of the St. Paul Companies, Inc., through purchases on the open market. St. Paul Companies' principal and wholly-owned subsidiary is St. Paul Fire & Marine Insurance Company, a Minnesota corporation. St. Paul Fire & Marine has a wholly-owned subsidiary incorporated in Wisconsin, St. Paul Fire and Casualty Insurance Company. St. Paul Fire and Casualty accounts for one-tenth of one percent of the statutory admitted assets and three percent of the premium income of the St. Paul holding company system.

St. Paul Companies has insurance company subsidiaries incorporated in eight states other than Wisconsin. In four of those states, and in Minnesota, approval of plain-

**1510**

tiff's proposed acquisition has been either granted or recommended, and in three of those states plaintiff's proposal has been denied (the outcome in the eighth state is not stated in the record).

On November 24, 1987, plaintiff filed with defendant an Insurance Holding Company Registration Statement, seeking approval to acquire in excess of ten percent of the common stock of St. Paul Companies. Defendant held a hearing on plaintiff's proposed acquisition in February 1988, and denied plaintiff's application for approval of the proposed acquisition on April 7, 1988.

Plaintiff had a right to judicial review of defendant's decision under Wis.Stat. ch. 227, and was advised in writing of that right by defendant. Plaintiff did not seek state court review, and the time to seek review expired on May 9, 1988. On April 28, 1988, plaintiff filed this action which is now before the court on defendant's motion to dismiss the complaint under the abstention doctrines of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

■ The magistrate filed a report recommending that the motion be granted on the ground that the elements requisite to *Younger* abstention are present: (1) there is a pending state proceeding, (2) that implicates important state interests, (3) and provides an adequate opportunity for plaintiff to raise its constitutional claims. Like the magistrate, I find that the state proceedings set in motion by plaintiff's application and the hearing called by defendant involve important state interests in the regulation of the domestic insurance industry, and that these proceedings provide plaintiff with an adequate opportunity to pursue the federal claims raised in this action.

I find it a very close question whether there is a "pending" state proceeding

where, as here, the proceeding being challenged is an administrative hearing that has ended and resulted in a final order. I conclude, however, that recent rulings of the United States Supreme Court direct a finding that a state proceeding is pending if an administrative proceeding has been initiated before a federal action is filed whether or not the proceeding itself is ongoing at the time the federal action is filed, and thus, I am constrained to find that state proceedings were pending when plaintiff filed this suit.

This result follows from the Supreme Court's steady expansion of the *Younger* doctrine, as discussed below in this order. This result also makes manifest the far-reaching implications of such expansion, namely that however important a plaintiff's interest in having a federal forum to hear important issues of federal constitutional law, the federal courts are closed to plaintiffs in any case in which a state administrative or judicial proceeding has been held, even if the plaintiff did not initiate the state proceeding or if the case would not be ripe until the state had acted to give the plaintiff a federal claim.

Nevertheless, I conclude that *Younger* abstention, as extended by the United States Supreme Court, is appropriate in this case, and I will adopt the magistrate's findings of fact and conclusions of law pertaining to *Younger* abstention, supplemented by the findings of fact and conclusions of law set forth in this order.[1]

*Supplementary Findings of Fact*

Of the eight states other than Wisconsin that have asserted a statutory right to approve plaintiff's proposed purchase of over ten percent of St. Paul Companies' shares, California, Minnesota and New York have approved the proposal; in Texas approval has been recommended; Indiana, Nebraska and North Dakota have denied the propos-

---

1. Because I will grant defendant's motion to dismiss on *Younger* abstention grounds, I do not consider defendant's argument that *Burford* abstention is also proper in this case. As the magistrate notes in his report and recommendation, the disposition of defendant's motion to

dismiss also renders unnecessary consideration of the motion to intervene of St. Paul Fire & Casualty Insurance Company and St. Paul Companies, Inc., and of the motion of these intervenors and plaintiff for summary judgment.

al; and the record does not disclose the outcome in Delaware.

In response to the federal court challenges to the state statutes' constitutionality that plaintiff filed in Indiana, Nebraska and North Dakota, motions to dismiss on *Younger* and *Burford* abstention grounds were denied in Indiana and North Dakota, and granted in Nebraska. *See Alleghany Corporation v. Eakin*, No. I.P. 88–561–C (S.D.Ind. Jan. 30, 1989); *Alleghany Corporation v. Pomeroy*, 698 F.Supp. 809 (D.N.D.1988); *Alleghany Corporation v. McCartney*, No. CV99–L–235 (D.Neb. Oct. 18, 1988).

## Opinion

The doctrine of abstention was established in *Younger* and expanded in subsequent cases to protect state processes from premature federal interference.[2] *Younger*, 401 U.S. at 44, 91 S.Ct. at 750 (principle of federalism requires that federal court "not unduly interfere with the legitimate activities of the states"); *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 528 (7th Cir.1988). In *Younger*, the United States Supreme Court held that under principles of comity, equity, and federalism, the federal courts should refrain from enjoining state criminal prosecutions. *Jacobson v. Village of Northbrook Municipal Corporation*, 824 F.2d 567, 569 (7th Cir.1987). In *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Court extended the holding in *Younger* to prevent federal courts from issuing declaratory judgments regarding state statutes that are subject to ongoing state criminal prosecutions. *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 431 n. 10, 102 S.Ct. 2515, 2521 n. 10, 73 L.Ed.2d 116 (1982). The contours of the *Younger* doctrine have since been steadily expanded to encompass pending quasi-criminal and civil judicial and administrative proceedings that implicate important state interests and provide a forum competent to vindicate constitutional challenges to those proceedings. *See, e.g., Pennzoil Company v. Texaco, Inc.*, 481 U.S. 1, 10–11, 107 S.Ct. 1519, 1525–26, 95 L.Ed.2d 1 (1987).

In *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (civil nuisance proceeding), the Supreme Court extended *Younger* abstention principles to include state-initiated civil proceedings in aid of and closely related to state criminal statutes. In *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (civil contempt order), the Court applied the *Younger* abstention doctrine to important state civil actions that may be analogous to criminal proceedings but that are not intricately bound up with the state's criminal statutes, and in *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (civil attachment proceeding), the Court confirmed that *Younger* is not confined to the criminal context but applies also to civil actions brought by the state to vindicate important state policies. In *Middlesex*, 457 U.S. at 423, 102 S.Ct. at 2515, the Court held definitively that *Younger* policies are fully applicable to state civil judicial proceedings when important state interests are involved, and in *Pennzoil*, 481 U.S. at 1, 107 S.Ct. at 1519, the Court held the implication of important court interests factor to be controlling for *Younger* abstention purposes where the state was not even a party to the state proceeding (but where the state plaintiff was a private party acting as a state actor). *Lemon v. Tucker*, 664 F.Supp. 1143, 1146 (N.D.Ill.1987).

In *Middlesex*, 457 U.S. at 432–33, 102 S.Ct. at 2521–22, the Court also ruled that administrative proceedings that are "judicial in nature" are within the category of civil judicial proceedings to which *Younger*

---

**2.** "The *Younger* doctrine is based on, and its contours established by, two principles of equity jurisprudence. The first is that an injunction is an extraordinary remedy, ... never more extraordinary than when, if granted it would prevent government officials from proceeding under a statute founded on important state interests against a violator of the statute.... The second principle is that an injunction will not be issued when the plaintiff has an adequate remedy at law, which he does if he can assert the ground on which he seeks an injunction as a defense to the very proceeding that the injunction would put a stop to." *W.C.M. Window Company v. Bernardi*, 730 F.2d 486 (7th Cir. 1984).

applies when important state interests are involved and when there is an adequate opportunity in those proceedings to raise constitutional challenges. In *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986), the Court broadly applied the *Middlesex* articulation of the *Younger* doctrine to ongoing state administrative proceedings, judicial or otherwise, in which important state interests are vindicated and in which the federal plaintiff would have a full and fair opportunity to litigate constitutional claims.

This dual focus on the importance of the state's interests and on the availability of a meaningful opportunity to raise constitutional objections before a competent state tribunal, has been codified in the form of a three-part test that the Supreme Court established in *Middlesex* and applied in subsequent cases to determine whether *Younger* abstention is appropriate in either the criminal or civil context: (1) the existence of a pending state judicial or administrative proceeding, (2) that implicates important state interests, (3) and provides an adequate opportunity for constitutional challenges to be raised. *Pennzoil*, 481 U.S. at 10–11, 107 S.Ct. at 1525–26; *Dayton*, 477 U.S. at 627, 106 S.Ct. at 2723; *Middlesex*, 457 U.S. at 432, 102 S.Ct. at 2521.

Plaintiff expands this test to include as additional determinative factors the existence of a state-initiated enforcement proceeding and the violation of state law. These may be common characteristics of many *Younger* and related cases. However, plaintiff does not cite to, and I am not aware of, any Supreme Court case that explicitly elevates these characteristics to be *Younger* requirements. Moreover, neither of these characteristics was present when the Court held *Younger* abstention appropriate in *Pennzoil*, 481 U.S. 1, 107 S.Ct. 1519.

■ In *Pennzoil*, Texaco (the federal plaintiff and state defendant) filed a federal action under 42 U.S.C. § 1983 against Pennzoil (the state plaintiff), seeking to enjoin Pennzoil from taking any action to enforce a multibillion dollar judgment that a Texas court had rendered against Texaco and in favor of Pennzoil. When Texaco filed its federal action, there had not yet been any enforcement proceeding, state-initiated or otherwise, and there had not yet been any violation of state law. Just as in the instant case in which the state would have to act to enforce its decision rendered against plaintiff at the concluded hearing should plaintiff refuse to abide by that decision, so in *Pennzoil* Pennzoil would have had to act, in conjunction with the state, to enforce the state trial court's judgment rendered against Texaco should Texaco have resisted the execution of that judgment. *See Lemon v. Tucker*, 664 F.Supp. at 1146. In both the instant case and in *Pennzoil*, state-initiated enforcement proceedings and violations of state law may follow from the federal plaintiff's taking action contrary to a state tribunal's decision, but such occurrences are not necessary for *Younger* abstention to be applicable before those occurrences take place.

■ Plaintiff also adds to the *Middlesex* test the absence of any preemption claims, arguing that abstention should not be invoked in preemption cases. "The federal courts of appeal are in disagreement on the question of whether the assertion of a preemption claim renders abstention by the federal district court inappropriate." *Fore Way Express, Inc. v. State of Wisconsin Department of Industry, Labor and Human Relations*, 660 F.Supp. 310, 312 (E.D. Wis.1987) (citing *Kentucky West Virginia Gas Company v. Pennsylvania Public Utility Commission*, 791 F.2d 1111, 1115–16 (3rd Cir.1986), *Middle South Energy v. Arkansas Public Service Commission*, 772 F.2d 404, 417 (8th Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986), *Champion International Corp. v. Brown*, 731 F.2d 1406, 1408–09 (9th Cir. 1984), and *Baggett v. Department of Professional Regulation, Board of Pilot Commissioners*, 717 F.2d 521, 524 (11th Cir. 1983), holding that the district court should not abstain; *New Orleans Public Service v. City of New Orleans*, 782 F.2d 1236, *vacated in part*, 798 F.2d 858, 860–864 (5th Cir.1986), and *Aluminum Co. v. Utilities*

Commission of State of North Carolina, 713 F.2d 1024, 1028–30 (4th Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), affirming decision to abstain in the face of federal preemption claims). In *Fore Way* the court followed the latter authorities and ruled that a preemption claim does not render *Younger* abstention inappropriate where there exists a complex state regulatory scheme that might be disrupted by federal court review and a state court system that is capable of addressing the federal plaintiff's constitutional challenges. 660 F.Supp. at 313. In the instant case, the challenged state statutes are also part of a complex state regulatory scheme that might be disrupted by federal court intervention, and the state courts are also capable of hearing and deciding plaintiff's federal claims.

In *Fore Way* the court based its ruling primarily on the analysis in *New Orleans Public Service*, 798 F.2d at 858, 863–64. In that case, as in the instant case, the claims before the court involved the intersection of state interests (in setting retail electricity rates) with federal interests (in wholesale rate making). *Id.* at 860. The court held *Younger* abstention to be proper based on the important state interests in setting retail rates, jurisdiction over which was explicitly reserved to the states by the Federal Power Act. *Id.* at 861. Similarly, in the instant case, where the state's interest in regulating insurance is derived from equally explicit language in the McCarran–Ferguson Act, 15 U.S.C. §§ 1011, 1012(a), plaintiff's preemption claim does not suffice to defeat the applicability of *Younger* abstention.

Finally, plaintiff makes the argument, addressed in the magistrate's report at 1535–36, that the *Middlesex* test is not applicable because plaintiff seeks prospective relief only. The Supreme Court has held that *Younger* does not bar resort to a federal forum where the federal plaintiff seeks to preclude future prosecution and not to change his or her record or to annul the results of prior state prosecutions. *Wooley v. Maynard*, 430 U.S. 705, 710–711, 97 S.Ct. 1428, 1432–33, 51 L.Ed.2d 752 (1977). In the instant case, plaintiff seeks

"prospective relief" against the enforcement of a decision made at the conclusion of an administrative hearing. Such relief, if granted, would annul the results of that hearing and is no different in effect from the enjoining of pending proceedings in order to prevent both the reaching and enforcement of a result, usually sought by federal plaintiffs in *Younger* cases. What may render *Younger* abstention inappropriate in this plaintiff's case is not that plaintiff seeks prospective relief, for the effect of the relief it seeks is not prospective, but that the proceeding whose decision plaintiff seeks to enjoin the state from enforcing is over.

Of the three *Middlesex* factors to be considered in determining whether *Younger* abstention is appropriate, the first—the existence of a pending state proceeding—is the most hotly contested by the parties in the case at bar. It is also the most complex. Because the analysis of this element depends in part on, and follows logically from, the analyses of the second and third *Middlesex* factors—the vindication of important state interests and the availability of an adequate opportunity to raise constitutional claims—these latter two elements will be discussed first.

*Important State Interests*

As the magistrate documents at pages 1531–32 of his report, the courts have recognized wide-ranging interests in the many cases in which *Younger* has been applied. The Supreme Court has never held a state interest to be unimportant, and only a few lower courts have so held. Note, *Slogan or Substance? Understanding "Old Federalism" and Younger Abstention*, 73 Cornell L.Rev. 852, 873–74 (May 1988) (citing *Texaco, Inc. v. Pennzoil*, 784 F.2d 1133, 1150 (2d Cir.1986) (state interest in bond provision relatively minor), *rev'd*, 481 U.S. at 1, 107 S.Ct. at 1519; *Mobil Oil Corporation v. City of Long Beach*, 772 F.2d 534, 542 (9th Cir.1985) (state suing in proprietary not sovereign capacity and seeking only money damages)); *see also W.C.M. Window Company, Inc. v. Bernardi*, 730 F.2d at 490 (interest in employment of state residents that underlies

**1514**

state preference law not as central to state goals as protection of health, safety and morals; but decision not to abstain based on fact that three plaintiffs could not join state proceeding); *First Alabama Bank of Montgomery, N.A. v. Parsons Steel, Inc.*, 825 F.2d 1475, 1482–83 (11th Cir.1987) (minimal state interest as adjudicator of wholly private dispute between private parties).

■ The instant case involves an alleged conflict between the state's interest in regulating the statewide business of insurance and the federal interest in overseeing nationwide corporate takeovers and in protecting interstate commerce. As the magistrate demonstrates at pages 1533–35 of his report, the factors defendant is required to take into account in ruling upon a request to acquire control shares under Wis.Stat. § 611.72 are not unrelated to the state's legitimate regulatory concerns for the solvency of domestic insurance companies and foreign insurance companies licensed to write insurance in Wisconsin, and for Wisconsin policyholders. I agree with the magistrate's conclusion that this statute implicates the state's interest in ensuring the financial stability of companies that offer insurance to state residents, and that this interest is substantial. Whether, in light of the federal interest in the non-insurance aspects of the transaction at issue, the state is entitled or authorized to effectuate this interest as provided for under the contested statutes goes to the merits of this action and need not (and should not) be decided in order to find the existence of important state interests for *Younger* abstention purposes.

Plaintiff's contention that the state's interests are minimal because there has been no violation of state law, the state has not initiated any enforcement proceeding, and the relief requested will not operate directly against any state court, *see Evans v. City of Chicago*, 689 F.2d 1286, 1294 (7th Cir.1982) (noting that as of 1982 "the exceptional *Younger* progeny which did not involve pending state initiated proceedings abstained from considering relief which would operate directly against a state

court") is based on a narrow reading of this element of the *Middlesex* test that may be inferred from the early *Younger* cases but is not borne out by more recent cases. *See Pennzoil*, 481 U.S. at 12–14, 107 S.Ct. at 1526–28; *W.C.M. Window*, 730 F.2d at 490 (protecting health, safety and morals of state residents is the type of interest involved in cases where *Younger* abstention has been ordered); and cases collected at 1532 n. 26 of the magistrate's report.

■ Plaintiff contends that the McCarran–Ferguson Insurance Regulation Act, 15 U.S.C. §§ 1011–1015, cannot be used to supply the important state interest in this case because application of the Act is in dispute and goes to the merits of the case. This contention is equally unavailing. The finding of an important state interest need not be supported by federal statute, and the concerns for state policyholders that are reflected in state statutes and in the conclusions of law made in defendant's order denying plaintiff's application for approval of the proposed acquisition suffice to establish the state's important interest in the consequences for state residents of the acquisition of a domestic insurer.

*Competent Forum/Adequate Opportunity to Raise Federal Claims*

A federal plaintiff has an adequate opportunity to raise constitutional challenges to a state proceeding before a state tribunal if such challenges may be heard in the challenged proceeding itself or in state court judicial review (either trial or appellate) of the proceeding, regardless whether the federal plaintiff seeks such review. *Pennzoil*, 481 U.S. at 15–17, 107 S.Ct. at 1528–29 (federal plaintiff's challenge to Texas bond provision could have been raised in trial court that entered judgment against plaintiff, and plaintiff could not escape *Younger* abstention by failing to do so); *Dayton*, 477 U.S. at 629, 106 S.Ct. at 2724 (where Dayton sought injunction against continuation of administrative proceedings on sex discrimination claims, it was sufficient for *Younger* abstention purposes that Dayton's constitutional claims could be raised in state court review of

those proceedings); *Middlesex*, 457 U.S. at 432–34, 102 S.Ct. at 2521–22 (where state ethics committee served formal statement of charges on lawyer who instead of filing answer filed suit in federal court, and disciplinary proceedings were subject to state court review, *Younger* abstention held appropriate); *Huffman*, 420 U.S. at 608–11, 95 S.Ct. at 1210–12; *Foster v. Zeeko*, 540 F.2d 1310, 1320 (7th Cir.1976); *Fore Way Express, Inc. v. Wisconsin Department of Industry, Labor and Human Relations*, 660 F.Supp. at 311.

*Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), is somewhat inconsistent with this articulation of the adequate opportunity factor. In *Gibson*, the Court stated that the fact that judicial review was forthcoming at the conclusion of the challenged administrative proceeding was irrelevant where the administrative tribunal itself was not competent because of bias, one of the exceptions to *Younger*. *Id.* 411 U.S. at 577, 93 S.Ct. at 1697. Under *Dayton*, 477 U.S. at 629, 106 S.Ct. at 2724, and *Middlesex*, 457 U.S. at 432–34, 102 S.Ct. at 2521–22, it would appear that such incompetence would be corrected by the availability of review. However, bias was not an issue in those cases, and it is not raised by plaintiff in the case at bar. Moreover, administrative tribunals in general are normally not competent to hear claims that statutes are unconstitutional. *See, e.g., Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975) (issue of constitutionality of statutory requirement is beyond Secretary's jurisdiction to determine); *Metropolitan Life Insurance Company v. Board of Directors*, 572 F.Supp. 460, 468 (W.D.Wis.1983) (state administrative body may not rule on constitutional challenges to the statutes under which it operates). It would be contrary to the holdings in post-*Gibson* cases such as *Dayton*, 477 U.S. at 619, 106 S.Ct. at 2718, and *Middlesex*, 457

U.S. at 423, 102 S.Ct. at 2515, to interpret *Gibson* to extend beyond bias and to bar *Younger* abstention wherever the administrative tribunal is not competent to hear constitutional claims, regardless of the opportunity to raise those claims in state courts upon review of the tribunal's decision.

■ As explained in the magistrate's report at 1528–29, Wis.Stat. §§ 227.53–.58 provide for judicial review by state trial and appellate courts of administrative hearings, and for the consideration of constitutional challenges in the course of such review. Accordingly, I agree with the magistrate's conclusion that the state proceedings set in motion by the statutorily required application and hearing at issue in the case at bar provide plaintiff with an adequate opportunity to raise in a competent state tribunal the federal defenses raised in this action.

*Pending State Proceeding*

The existence of a pending state proceeding is necessary to trigger *Younger* abstention and is the critical issue to be determined on this motion. Indeed, it is to this issue that most of plaintiff's objections to the magistrate's report are addressed.[3] The magistrate found that the completed hearing in the instant case was part of an "adjudicative continuum" because it is subject to rehearing and judicial and appellate review. Plaintiff objects that the availability of appellate review relates to the adequate opportunity factor of the *Middlesex* test, that no comity concerns are implicated when the administrative hearing is over, and that if, as in this case, a completed administrative proceeding is held to be "pending," then no party to a state administrative proceeding can ever raise federal claims in federal district court and federal plaintiffs will be forced to bypass state

---

3. Plaintiff's other objections are directed at the magistrate's analysis of the important state interest factor and are disposed of at page 1514 above. Plaintiff's one remaining objection, that state courts are inadequate to resolve multistate federal constitutional challenges (despite the fact that federal courts in different circuits can no better guarantee uniformity), may be relevant to choice of forum but does not refute the *Younger* principle that federal courts should not interfere with state application and prosecution of state laws and the related proposition that state courts are competent to evaluate the constitutionality of state laws.

**1516**

administrative agencies in order to get into federal district court. These objections will be addressed in the course of the analysis that follows.

Whether the state proceeding in question is pending is not an issue when the proceeding is in state court or before an administrative tribunal for a decision and is actually ongoing at the time the federal action is commenced or before there is substantial advancement in the federal action. *Dayton,* 477 U.S. at 627–28 n. 2, 106 S.Ct. at 2723–24 n. 2. The problem arises when the state proceeding has yielded a decision and is no longer ongoing when the federal action is filed.

When the state proceeding is in a trial court and the court has entered judgment, the proceeding is apparently considered to be pending for *Younger* abstention purposes.[4] The reasoning for such a determination is unclear. In *Huffman,* 420 U.S. at 592, 95 S.Ct. at 1200, the first case in which the Court addressed the "pending" element where the state proceeding had ended, the Court applied to state trial proceedings only the requirement that the federal plaintiff continue through state appellate remedies before seeking relief. *Id.* at 608, 95 S.Ct. at 1210. The Court stated that the fact that the federal plaintiff may no longer be able to appeal is irrelevant. *Id.* at 611 n. 22, 95 S.Ct. at 1211 n. 22. The Court seems to have based this requirement on the availability of a competent state tribunal to decide the federal issues, *id.* at 594, 605, 95 S.Ct. at 1203, 1208, a consideration that was incorporated in subsequent cases in the adequate opportunity factor of the *Middlesex* test. *See* cases cited in preceding section; *see also Brown v. Scott,* 462 F.Supp. 518, 521 (N.D.Ill.1978) (opportunity to raise federal claims in state court, either on appeal or review, did not change threshold *Younger* requirement that state court proceeding be pending).

The distinction made in *Huffman* between state court and administrative proceedings was eliminated when the Supreme Court extended *Younger* to administrative proceedings in *Middlesex* and *Dayton.* In those cases the proceedings at issue were ongoing and so the Court did not reach the question whether they were pending. The Court based its decision to extend *Younger* on its determination of the other two factors of the *Middlesex* test, the implication of important state interests and the availability of an adequate opportunity to raise federal claims in the course of judicial review.

In *Middlesex* and *Dayton,* the Court also stated that the *Younger* concerns of comity and federalism are as applicable to pending civil proceedings as to pending criminal prosecutions. 457 U.S. at 432, 102 S.Ct. at 2521; 477 U.S. at 627, 106 S.Ct. at 2723. However, these principles are not directly applicable to administrative proceedings, ongoing or completed, where, as here and in most other instances, the administrative tribunal has no authority to decide the federal plaintiff's constitutional challenges. As plaintiff notes in its objections to the magistrate's report, where the constitutional challenges cannot be entertained, there is no disruption of the pending proceeding because no issue that could be decided is being reopened, and there is no duplication of separate legal proceedings addressing identical issues because the constitutional issues are not within the state forum's jurisdiction. *See Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974). There is also no disrespect even though the state court could hear the constitutional claims if the federal plaintiff instituted a proceeding in state court, because there is no requirement that § 1983 actions must first be filed in state court.[5]

4. In *Pennzoil,* 481 U.S. at 1, 107 S.Ct. at 1519, the Supreme Court did not address whether the state proceeding was pending, perhaps because judgment was entered by the trial court after the federal action was filed. *Id.* at 17, 107 S.Ct. at 1529 (judgment entered later the same day).

5. The Supreme Court has been careful to include disclaimers against the erosion of the § 1983 exemption from the exhaustion of remedies requirement even as it has narrowed that exemption by its expansive application of *Younger* to non-criminal, non-ongoing, proceedings. *See, e.g., Dayton,* 477 U.S. at 627–28 n. 2, 106 S.Ct. at 2723–24 n. 2; *Huffman,* 420 U.S. at

However, *Middlesex* and *Dayton* appear to require that where an administrative proceeding has taken place, even though the federal plaintiff was not required to *initiate* an action in state court, he or she must *continue* in state court. The reason for this is that even if the administrative tribunal may not decide constitutional claims, the state court may and the federal court's intervention would reflect negatively on the state court's ability to enforce constitutional principles in the course of its review of the administrative proceeding. This concern with the showing of disrespect for the state court that can review the administrative proceeding may be attenuated, but it applies whether the administrative proceeding is ongoing or completed at the time the federal suit is filed.

The competency of the state tribunal to decide constitutional claims is a critical distinction between administrative and court proceedings. Based on that distinction, it could be concluded that unlike a completed trial a completed administrative hearing should not trigger *Younger* abstention, because whereas the federal plaintiff could have raised constitutional claims at trial such claims could not have been considered in the administrative hearing. However, this distinction exists even where the administrative proceeding has not yet ended —even where it is ongoing the federal plaintiff's constitutional claims may not be decided until judicial review of the hearing. Nevertheless, this distinction has not prevented the Supreme Court from applying *Younger* to ongoing administrative hearings. *See Dayton*, 477 U.S. at 619, 106

S.Ct. at 2718; *Middlesex*, 457 U.S. at 423, 102 S.Ct. at 2515. Because this distinction cannot be used to hold *Younger* applicable to ongoing administrative proceedings but not to completed administrative proceedings, there is no basis for using this distinction to hold *Younger* applicable to completed trials but not to completed administrative proceedings.

█ It appears that, where the Supreme Court has found that important state interests are involved in the administrative proceeding that is being challenged, the Court has decided to defer to the state court that could review that proceeding and hear the constitutional challenges in that review—in other words, to give the state court the first opportunity to hear claims emanating from state proceedings and challenging state laws. Because the comity concerns related to disruption and duplication are not implicated either when an administrative proceeding is pending or when it is not (see discussion above at page 1516), and because the comity concern related to disrespect is indirectly implicated both when an administrative proceeding is pending and when it is not, the determination whether *Younger* principles are implicated does not depend on whether the administrative proceeding is pending.[6] Rather, the key concern seems to be deference to state courts where the state has enforced its laws or begun to enforce them, by refraining from interfering with state court review of administrative application of state law. *See Lemon v. Tucker*, 664 F.Supp. at 1147 (*Younger* policy of noninterference

610 n. 21, 95 S.Ct. at 1211 n. 21; *Bethune Plaza*, 863 F.2d at 529. Although the Court's cryptic assurances that the § 1983 exhaustion of remedies exemption remains intact may be belied by the practical effect of recent *Younger* decisions, it is still true that a federal plaintiff is not required to initiate either state administrative or judicial remedies prior to bringing a § 1983 suit in federal court. Indeed, as is made clear in the remainder of this order, it is only when federal plaintiffs do not initiate proceedings before state administrative tribunals or in state trial courts, and instead file a § 1983 action in federal court before such proceedings are initiated against them, that their right to sue under § 1983 in federal district court is preserved. *See People of State of Illinois v. General Electric*

*Company,* 683 F.2d 206 (7th Cir.1982) (*Younger* abstention held inappropriate where state began enforcement proceeding *after* General Electric filed suit in federal court).

**6.** The irrelevance of whether the proceeding is actually ongoing at the time the federal suit is filed was foreshadowed by the statement in *Huffman* that although *Younger* turned on the fact that the state court proceeding was *pending,* the pending element was used only to distinguish proceedings that had already commenced from those that were merely incipient or threatened, and the argument that the state proceeding had ended was of no consequence. 420 U.S. at 606–07, 95 S.Ct. at 1209–10.

**1518**

with state proceedings applies where state prosecuting its laws).[7]

In sum, just as the statutory availability of appellate review renders a completed trial pending for *Younger* purposes, *Huffman*, 420 U.S. at 607–611, 95 S.Ct. at 1209–12, so the availability of judicial review renders a completed administrative proceeding pending, because the same *Younger* concerns that apply to ongoing administrative proceedings apply to ended administrative proceedings. This means that state proceeding (not tainted by bias, bad faith or harassment) for which the state offers statutory appellate review through its courts or otherwise is pending for *Younger* purposes from the time it is initiated, as long as the federal action is filed after such initiation, until it has completed the review process.[8] At that point, the federal plaintiff may be barred by the principle of *res judicata* from pursuing his or her claims, and may be able to proceed only by writ of certiorari to the United States Supreme Court. The Court of Appeals for the Seventh Circuit has said as much in rather expansive dicta in *Bethune Plaza*, 863 F.2d at 528–29:

> A state is entitled to continue in its own courts (or administrative tribunals, for there is no sharp distinction between a state "court" and a state "adjudicatory agency") litigation begun there, without having the suit under § 1983 serve as a form of federal-defense removal.... If the state's tribunal is competent to resolve the federal defense, then the litigation must continue in that forum.[9]

Thus, *Younger*, as steadily broadened by the Supreme Court, now operates to deny the party brought before an administrative tribunal the opportunity to choose a forum for challenging the proceeding when it is over, and to confine § 1983 actions challenging administrative proceedings to state courts. Such a result significantly erodes "the paramount role Congress has assigned to the federal courts to protect constitutional rights," *Steffel*, 415 U.S. at 473, 94 S.Ct. at 1222, despite the Supreme Court's avowed adherence to the § 1983 exhaustion

7. There is some language that suggests the state proceeding must be "coercive" for this concern to be triggered. *Dayton*, 477 U.S. at 627–28 n. 2, 106 S.Ct. at 2723–24 n. 2. One factor bearing on the coercive nature of the proceeding in question is whether federal plaintiffs must raise their constitutional claims as defenses to the state proceeding. *Lemon*, 664 F.Supp. at 1147 (federal plaintiffs are not in a coercive posture when they are the state plaintiffs, or "prosecutors," seeking to obtain affirmative remedies from a state agency). That plaintiff in the instant case would have had to raise its federal claims as defenses to the hearing it challenges suffices to bring the state's interest in enforcing its laws to bear.

8. Until the Supreme Court applied *Younger* in *Pennzoil*, 481 U.S. at 1, 107 S.Ct. at 1519, to a state proceeding in which the state was not a party, most courts held that *Younger* abstention may apply only to a "state-initiated adjudication pending in a state forum." *See, e.g., Jordi v. Sauk Prairie School Board*, 651 F.Supp. 1566, 1575 (W.D.Wis.1987) (citing *Evans v. City of Chicago*, 689 F.2d 1286, 1294 (7th Cir.1982)). In the instant case, the fact of which party initiated the challenged hearing is disputed. Plaintiff avers that it initiated the administrative proceeding by submitting its application for approval of its proposal to purchase St. Paul Companies. However, as defendant notes, plaintiff was required by state law to submit the applica-

tion, and defendant called the hearing in response to the application pursuant to the same state law. Thus, plaintiff initiated the adjudicatory process to which I conclude *Younger* applies, and defendant initiated the actual proceeding that I conclude triggered the application of *Younger*, but it was state law that prompted either or both parties to set in motion the process that I have found implicates the important state interests that bring the *Younger* concerns to bear. In any case, whether the state initiated the process seems to be irrelevant after *Pennzoil*.

9. In *City Investing Company v. Simcox*, 633 F.2d 56, 60 n. 10 (7th Cir.1980), the Seventh Circuit Court of Appeals expressed a somewhat different view of the role of federal district courts: The rule of this circuit is that "[a]bstention from the exercise of federal jurisdiction ... is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it ... [and is to be applied] only in exceptional circumstances where the order of the parties to repair to the State court would clearly serve an important coutervailing interest." (Quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). The court's more expansive 1988 view of *Younger* abstention as expressed in *Bethune Plaza*, 863 F.2d at 528–529, reflects the Supreme Court's steady extension of *Younger* over the last decade.

exemption that preserves this paramount role. Plaintiff fails to suggest, and I am unable to find, any justifiable means of reconciling such avowals with the Court's rulings that the availability of state judicial and appellate review suffices to trigger *Younger* abstention, in order to avoid this far-reaching result.

Accordingly, I am constrained to find that the challenged hearing in the instant case is pending for purposes of *Younger* abstention. Having also found that the hearing implicates important state interests and presents plaintiff an adequate opportunity to raise its constitutional claims in the course of judicial review, I conclude that abstention on *Younger* grounds is appropriate,[10] and I will adopt the Magistrate's

Report and Recommendation as supplemented by my own conclusions of law as set forth above.[11]

### *Order*

IT IS ORDERED that the Magistrate's Report and Recommendation is adopted as supplemented by the findings of fact and conclusions of law set forth in this order, and that defendant's motion to dismiss this case is GRANTED.

## REPORT AND RECOMMENDATION

JAMES GROH, United States Magistrate.

Plaintiff, Alleghany Corporation (Alleghany), brings this action for declaratory

---

**10.** The district courts in Indiana and North Dakota have concluded to the contrary and declined to abstain in actions identical to the instant action brought by this plaintiff before those courts. *Alleghany Corporation v. Eakin,* No. I.P. 88–561–C (S.D.Ind. Jan. 30, 1989) and *Alleghany Corporation v. Pomeroy,* 698 F.Supp. 809 (D.N.D.1988). As noted in the magistrate's report at p. 1533 n. 29, the decision by the North Dakota court in *Alleghany Corporation v. Pomeroy* is inapposite because the court found that constitutional challenges could not be raised on judicial review of the Commissioner's decision under North Dakota statutes, and therefore one of the *Middlesex* factors was not present. *Id.* at 812–13.

    In *Alleghany Corporation v. Eakin,* the district court in Indiana found *Younger* inapplicable, reasoning that there was no pending proceeding because the plaintiff had received a final determination on its application at the concluded hearing, even though the plaintiff "could have availed itself of judicial review of the denial of its application in the Indiana state courts...." *Id.* at 7. The court relied primarily on *Thomas v. Texas State Board of Medical Examiners,* 807 F.2d 453, 456–57 (5th Cir.1987), and *People of State of Illinois v. General Electric Company,* 683 F.2d 206 (7th Cir.1982). As discussed in the magistrate's report at pp. 28–30, *Thomas* may be distinguished by the existence of certain elements, such as the request for damages and the charge of a personal vendetta, that would make *Younger* abstention inapplicable even if the administrative proceeding had been ongoing. More important, the finding in *Thomas* that the availability of state court review did not render *Younger* abstention inappropriate is contrary to the United States Supreme Court's application and extension of *Younger* as discussed in this order.

    Like *Thomas, General Electric,* 683 F.2d at 206, is also distinguishable from the instant

case and the force of its reasoning has been diluted by subsequent Supreme Court cases. In *General Electric,* where the court declined to abstain when General Electric sued in federal court for a declaratory judgment that an Illinois law was unconstitutional, General Electric had not yet been brought before any state tribunal. The state began its enforcement proceedings a few hours after General Electric commenced its suit in federal court. *Id.* at 208. (Under *Dayton,* 477 U.S. at 627–28 n. 2, 106 S.Ct. at 2723–24 n. 2, such a sequence might no longer suffice to render *Younger* abstention inapplicable because the state proceeding was initiated before the federal action had substantially advanced.)

    However, more important to the court than the order of the suits was whether a state statute had been violated. *Id.* at 212–13. As in the instant case, the federal plaintiff had not violated state law when it filed suit in federal court. The federal plaintiff had also not yet violated the state law it was challenging in *Pennzoil,* 481 U.S. at 1, 107 S.Ct. at 1519, yet the Supreme Court held *Younger* abstention to be appropriate nevertheless because of the importance of the state interests implicated by that law. *Id.* at 12–14, 107 S.Ct. at 1526–28. Thus, the lynchpin of the *General Electric* decision is no longer required for *Younger* to apply, and the analysis in more recent cases weakens *General Electric's* precedential value. Even so, the court in *General Electric* anticipated the subsequent trend in *Younger* case law when it stated that "it is unseemly to allow a single federal district judge to enjoin a state statute." *Id.* at 213.

**11.** However, I do not agree with the statement in the Magistrate's report at 41 that "[t]o hold otherwise would render the [*Younger*] doctrine a virtual nullity."

judgment seeking a determination that Wis.Stats. §§ 611.72 and 617.12 are unconstitutional and for injunctive relief to prohibit defendant Commissioner of Insurance from enforcing them. Those sections prohibit, *inter alia*, the execution of any plan for the acquisition of control (as defined in Wis.Stats. § 600.03(13)) of any domestic stock insurance company, or its parent holding company wherever organized, without the approval of the defendant.

Alleghany seeks to acquire presumptive control (in excess of ten percent of the common stock) of the St. Paul Companies, Inc. (ST. PAUL), a publicly-traded insurance holding company domiciled in Minnesota, through purchases on the open market. ST. PAUL's principal (and wholly-owned) subsidiary is St. Paul Fire & Marine Insurance Company (FIRE & MARINE), a Minnesota corporation. FIRE & MARINE, in turn has a wholly-owned subsidiary incorporated in Wisconsin, St. Paul Fire and Casualty Insurance Company (FIRE & CASUALTY). After application and hearing, in conformity with the applicable state statutes and regulations, the Commissioner denied Alleghany's request. (Cmpl.Ex. C) Alleghany did not pursue the statutory review procedure through the Wisconsin courts. Wis.Stats §§ 227.48, .49 and .53. Instead, Alleghany filed this action which is now before the court on the Commissioner's motion to dismiss the complaint under the abstention doctrines of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 2d 669 (1971) and *Burford v. Sun Oil, Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). (Dkt. # 6) This report and recommendation, submitted pursuant to 28 U.S.C. § 636(b)(1)(B), recommends that the motion be granted.[1]

## FINDINGS OF FACT

For the purpose of deciding this motion only, I find the following facts from the well-pleaded allegations of the complaint. (Dkt. # 1):

1. The plaintiff, Alleghany Corporation, is a Delaware corporation with its principal place of business in New York, New York. It is a publicly-held company whose common stock is listed and traded on the New York Stock Exchange. (Cmpl. ¶ 3)

2. The defendant, Robert D. Haase, is the Commissioner of Insurance of the State of Wisconsin. As such, he has the duty to administer and enforce the insurance laws of Wisconsin, including those pertaining to transfers of control of insurance companies. (Cmpl. ¶¶ 1, 4; Wis.Stat. § 601.41(1)). Defendant is a resident of the Western District of Wisconsin. (Cmpl. ¶ 6)

3. In July, 1987, Alleghany began to acquire, on the open market, common stock of The St. Paul Companies, Inc. (ST. PAUL), an insurance holding company incorporated and domiciled in Minnesota whose common stock is quoted on the NASDAQ National Market System and is registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*). (Cmpl. ¶ 7)

4. St. Paul Fire and Casualty Insurance Company (FIRE & CASUALTY), a Wisconsin corporation, is a wholly-owned subsidiary of St. Paul Fire and Marine Insurance Company (FIRE & MARINE), a Minnesota corporation, which, in turn, is a wholly-owned subsidiary of ST. PAUL. (Cmpl. ¶ 18)

5. As a result of its purchases, Alleghany owns, directly or indirectly, approximately 9.2 percent of ST. PAUL's outstanding common stock and seeks to acquire over 10 percent of the common stock through further open market purchases. (Cmpl. ¶ 7)

6. Alleghany's acquisition of shares of ST. PAUL is subject to the Williams Act, 15 U.S.C. §§ 78m(d), (e) and 78n(d)–(f). Alleghany filed a Schedule 13D with the Securities Exchange Commission discussing its plans and proposals regarding control

1. St. Paul Fire & Casualty Ins. Co. and St. Paul Companies, Inc., respectively, the Wisconsin insurer and its grandparent (the direct object of plaintiff's acquisition effort) have filed a motion for leave to intervene. (Dkt. # 3) Defendant (Dkt. # 22), plaintiff (Dkt. # 8), and the intervenors (Dkt. # 27) have all filed motions for summary judgment as well. The disposition of the instant motion renders consideration of the other motions unnecessary.

and changes in the business of ST. PAUL upon acquiring more than 5 percent of ST. PAUL's stock as required by the Williams Act and regulations issued thereunder. (Cmpl. ¶¶ 37, 38 and 40; 15 U.S.C. § 78n(d)(1); 17 CFR § 240.13d–1.[2]

7. Forty-seven states, including Wisconsin and Minnesota, have adopted similar statutes reserving to the Commissioner of Insurance, or equivalent official, the authority to approve or disapprove a proposed acquisition of control of a domestic insurance company or its parent holding company, and to require the filing of a disclosure statement and a hearing before the appropriate insurance official in advance of such acquisition. The ownership of more than 10 percent of the voting securities of such a company creates a rebuttable presumption of control. (Cmpl. ¶¶ 13, 20, Wis.Stats. §§ 600.03(13), 611.72(2) and (3), and 617.12) (hereafter sometimes collectively referred to as "the Act" or "the Wisconsin Act").[3]

2. There is no allegation that Alleghany has initiated, or intends to initiate, a tender offer, so the provisions of Section 14(d) (15 U.S.C. § 78n(d)) have not been engaged.

3. Aside from noting the similarity of the statutes, the complaint does not cite the specific statutes of any states other than Wisconsin. The legislation appears to have had its origins in the Model Insurance Holding Company System Regulatory Act adopted by the National Association of Insurance Commissions in 1969. 2 Proc. NAIC, p. 735–738. See Cmpl.Ex.A, p. 22–24.

Wis.Stat. § 600.03(13) defines control:

(13) "Control" means that possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, by common management or otherwise. A person having a contract or arrangement giving that person control is deemed to be in control despite any limitations placed by law on the validity of the contract or arrangement. There is a rebuttable presumption of control if a person directly or indirectly owns, holds with the power to vote or holds proxies to vote more than 10% of the voting securities of another person, except that no person shall be presumed to control another person solely by reason of holding an official position with that person. "Control" has the same meaning in the terms "controlling", "controlled by" and "under common control with". See also "affiliate".

Wis.Stat. § 600.03(1) defines affiliate:

(1) "Affiliate" of a person means any other person who controls, is controlled by, or is under common control with, the first person. A corporation is an affiliate of another corporation, regardless of ownership, if substantially the same group of persons manage the 2 corporations.

Wis.Stat. § 611.72 states, in pertinent part:

(2) **Approval required.** No proposed plan of merger or consolidation under ss. 180.62 to 180.685 and 180.72 *or other plan for acquisition of control may be submitted to the shareholders of any domestic stock insurance corporation or its parent insurance holding corporation* participating in the transaction or *exe-cuted unless it has been approved by the commissioner.* [emphasis added]

(3) **Grounds for disapproval.** The commissioner shall approve the plan if the commissioner finds, after a hearing, that it would not violate the law or be contrary to the interests of the insured of any participating domestic corporation or of the Wisconsin insureds of any participating nondomestic corporation and that:

(a) After the change of control, the domestic stock insurance corporation or any stock insurance corporation controlled by the insurance holding corporation would be able to satisfy the requirement for the issuance of a license to write the line or lines of insurance for which it is presently licensed;

(b) The effect of the merger, consolidation or other acquisition of control would not be to create a monopoly or substantially to lessen competition in insurance in this state;

(c) The financial condition of any acquiring party is not likely to jeopardize the financial stability of the domestic stock insurance corporation or its parent insurance holding corporation, or prejudice the interests of its Wisconsin policyholders;

(d) The plans or proposals which the acquiring party has to liquidate the domestic stock insurance corporation or its parent insurance holding corporation, sell its assets, or consolidate or merge it with any person, or make any other material change in its business or corporate structure or management are fair and reasonable to policyholders of the domestic stock insurance corporation or in the public interest; and

(e) The competence and integrity of those persons who would control the operation of the domestic stock insurance corporation are such that it would be in the interest of the policyholders of the corporation and of the public to permit the merger or acquisition of control.

\*    \*    \*    \*    \*    \*

Wis.Stat. § 617.12 states:

Any person attempting to acquire control over a domestic insurer shall be subject to the same duties with respect to reports and replies to the commissioner as are provided by law for the insurer, to the extent reasonably

7. On November 12, 1987, Alleghany filed its Form A Statement Regarding the Acquisition of Control of a Domestic Insurer (ST. PAUL) with the Minnesota Commissioner of Commerce. A hearing was held before an administrative law judge on December 16 and 17, 1987, at which an extensive record was developed. On January 11, 1988, the Deputy Commissioner of Commerce adopted the recommendation of the administrative law judge that Alleghany be permitted to acquire up to 20 percent of ST. PAUL's stock, with any additional purchases to be made only after obtaining further approval from the Commissioner. (Cmpl. ¶¶ 8–11 and Exs. A, p. 22, and B, p. 17) The order of the Deputy Commissioner is under review in the Minnesota courts. (Cmpl. ¶ 12) [4]

9. The State of Wisconsin also asserts the independent and separate authority to approve or disapprove of Alleghany's proposal to purchase over ten percent of ST. PAUL's stock because ST. PAUL's sub-subsidiary, FIRE & CASUALTY, is incorporated in Wisconsin. (Cmpl. ¶¶ 17, 19 and 20 and statutes at n. 3, *supra*.) Alleghany does not seek to acquire the shares of FIRE & CASUALTY itself, which would continue to be the wholly-owned subsidiary of FIRE & MARINE. (Cmpl. ¶¶ 18 and 21.)

10. In 1987, approximately two percent of ST. PAUL's insurance premiums came from Wisconsin. FIRE & CASUALTY accounts for approximately three percent of ST. PAUL's premium and less than one-tenth of one percent of ST. PAUL's admitted assets. FIRE & MARINE reinsures the policies written by FIRE & CASUALTY.

11. Alleghany filed an Insurance Holding Company Registration Statement with the Wisconsin Department of Insurance on November 24, 1987, pursuant to Wis.Stats. §§ 611.72 and 617.12 and regulations promulgated thereunder. (Cmpl. ¶¶ 1, 27; s. Ins. 12.01(11) Wis.Adm.Code)

12. Defendant held a hearing on Alleghany's proposed acquisition of the stock on February 10–11, 1988, as required by Wis.Stat. 611.72(3) and s. Ins. 12.01(12)(a), Wis.Adm.Code. (Cmpl. ¶¶ 23 and 27).[5]

13. On April 7, 1988, defendant issued a decision and order denying Alleghany's application for approval of the proposed acquisition. (Cmpl. ¶ 27 and Ex. C.) [6] For his conclusions of law, defendant stated:

(84) Alleghany has the burden of proof in this proceeding to show by a preponderance of the evidence that its plan of acquisition is not contrary to the interests of the insureds of any participating domestic corporation or of the Wisconsin insureds of any participating non-domestic corporation and that the five criteria specified under s. 611.72(3)(a) to (e), Wis. Stat., are fulfilled.

(85) Alleghany's plan of acquisition is contrary to the interests of the insureds of St. Paul Fire and Casualty, the Wisconsin insureds of St. Paul, and the public.

(86) Alleghany has failed to sustain its burden to show that the effect of the acquisition of control would not be to create a monopoly or substantially to lessen competition in insurance in this state.

(87) Alleghany has failed to sustain its burden to show that its financial condition is not likely to jeopardize the financial stability of the domestic stock insur-

necessary to carry out the purposes of this chapter, and shall be subject to the jurisdiction of the commissioner and the courts of this state for the enforcement of such duties. Section 617.12 was repealed, effective March 25, 1988, by 1987 Wis.Act 167 ¶¶ 5, 10 and consolidated with Section 617.11 governing reports on insurer affiliates. This change has no apparent effect on the issues in this case.

**4.** The complaint does not reveal by whom the review was sought or the issues presented for review. It is clear, however, that ST. PAUL opposed the application in the administrative proceedings. (Cmpl. ¶¶ 9 and 11 and Ex. A, p. 1, 22)

**5.** The hearing procedures are spelled out in the Commissioner's regulations. s. Ins. 5.01 *et seq.*, Wis.Adm.Code.

**6.** This decision and those of the Minnesota regulatory authorities (Cmpl.Exs. A & B) contain extensive findings of fact (over 40 pages) about Alleghany and ST. PAUL and the proposed acquisition.

ance corporation or its parent insurance holding corporation, or prejudice the interests of its Wisconsin policyholders.

(88) Alleghany has failed to sustain its burden to show that the plans or proposals which it has to liquidate the domestic stock insurance corporation or its parent insurance holding corporation, sell its assets, or consolidate or merge it with any person, or make any other material change in its business or corporate structure or management are fair and reasonable to policyholders of the domestic stock insurance corporation or in the public interest.

(89) Alleghany has failed to sustain its burden to show that the competence and integrity of those persons who would control the operation of the domestic stock insurance corporation or its parent insurance holding corporation are such that it would be in the interest of the policyholders of the corporation and of the public to permit the acquisition of control.

(90) The Commissioner has the authority under the McCarran–Ferguson Act, 15 U.S.C. ss. 1011–1015, to deny Alleghany's petition.

(Cmpl. Ex. C, p. 21) [7]

14. Shares of ST. PAUL common stock are traded in interstate commerce. The effect of defendant's order is to prevent Alleghany from making further purchases of ST. PAUL common stock outside the State of Wisconsin through public trades with sellers located outside Wisconsin. (Cmpl. ¶¶ 2, 30)

15. Eight other states have asserted a similar statutory right to approve Alleghany's proposed purchase of over 10 percent of ST. PAUL's shares—California, Indiana, Nebraska, North Dakota, New York, Texas, Delaware, and Illinois. Alleghany has filed applications for approval in all these states and hearings were held in Indiana, Nebraska, North Dakota and Texas. Live testimony was permitted or required at all hearings (including Wisconsin), all of which were held after the Minnesota hearing. (Cmpl. ¶¶ 13 and 14) After a contested proceeding, California approved the acquisition of up to 20 percent of ST. PAUL's stock. The Insurance Commissioners of Indiana, North Dakota, and Nebraska have disapproved the applications.[8]

16. This action was filed April 28, 1988. This court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper pursuant to 28 U.S.C. § 1391.

## CONCLUSIONS OF LAW

### Introduction

The focal issues in this action for declaratory and injunctive relief are whether Wis. Stats. §§ 611.72 and 617.12 are unconstitutional under the Supremacy Clause and the Commerce Clause of the United States Constitution (Art. VI, cl. 2 and Art. I, § 8, cl. 3).[9] The purpose and effect of this legisla-

---

7. The decision also notified Alleghany of its right, within 30 days, to petition for a rehearing pursuant to Wis.Stat. § 227.49 or to seek judicial review in Wisconsin Circuit Court under Wis.Stat. § 227.53 (Ex.C. at 22–23) Plaintiff concedes that it did not seek relief or review under these provisions. (Brief at 4, Dkt. # 15)

8. Notice may be taken of later developments in other jurisdictions. Federal court challenges to the constitutionality of the state statutes have been filed in Nebraska and North Dakota. *Alleghany Corp. v. McCartney*, No. CV–88–L–235, *Alleghany Corp. v. Pomeroy*, No. A1–88–096. Motions to dismiss on abstention grounds were filed in each case. The motion was granted in *McCartney*, on October 18, 1988, and the opinion appears at Docket No. 47. The motion was denied in *Pomeroy*, 698 F.Supp. 809 (Opinion at Docket No. 35A) and 700 F.Supp. 460 on Octo-

ber 28, 1988, the district court found the North Dakota statute to be an unconstitutional infringement of the Commerce Clause and granted Alleghany's Motion for Summary Judgment. (Opinion at Docket No. 50)

9. Alleghany seeks a declaration of the constitutional invalidity of the statutes and an injunction barring defendant from invoking or enforcing them against it. Briefly stated, Count I alleges that the legislation, on its face and as applied, constitutes the impermissible state regulation of interstate commerce by regulating or prohibiting transactions in ST. PAUL's securities between non-resident buyers and sellers and by subjecting Alleghany to duplicative or inconsistent regulation. (Cmpl. ¶¶ 28–35) Count II alleges that the statutory scheme, on its face and as applied, is in direct conflict with the Williams Act which, it is alleged, has preempted the regu-

tion is to reserve to the defendant Commissioner the authority to approve or disapprove the transfer of control of a domestic insurance company (*i.e.* one incorporated in Wisconsin; Wis.Stats. § 600.03(17)), or its parent company, wherever domiciled. In this case the Commissioner's exercise of that authority translates into a prohibition against Alleghany's further purchase of ST. PAUL shares.

The issues presented by this case are complex and far-reaching, arising as they do at the intersection of two otherwise unrelated regulatory systems, one state and the other federal—the supervision of the insurance industry and the regulation of the (interstate) market in publicly-traded securities. Although insurance is a business affecting interstate commerce, *United States v. South–Eastern Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), Congress, in the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, has reserved to the states the exclusive authority to regulate "[t]he business of insurance and every person engaged therein" in the absence of an express declaration of Congress to the contrary. 15 U.S.C. § 1012.[10] The Wisconsin legislation, defendant argues, is an exercise of that authority. Broadly stated, its putative purposes are to protect the financial condition of Wisconsin insurers, to protect Wisconsin policyholders, and to foster stable markets and com-

petition. That legislation is not an aberration. It is represented that forty-seven states have adopted it in some form, and it apparently derives from a model act endorsed by the National Association of Insurance Commissioners.[11] This fact contributes to the complexity of the overall controversy, at least on the surface, as eight other states (in six federal judicial circuits) have also asserted regulatory jurisdiction over Alleghany's proposed acquisition under their versions of the legislation.[12] This lawsuit, then, may be viewed as just one act in a labrynthine multi-state drama of which relatively little is (or need be) known at this juncture. Other scenes are being played out in the districts of Nebraska and North Dakota and in the state courts of Minnesota. While those proceedings are of interest, they provide no more than persuasive authority on the issues of the instant motion or the merits of Alleghany's complaint.

As noted, Alleghany's case is anchored first on Sections 13(d) and (e) and 14(d)–(f) of the Securities Exchange Act of 1934, as amended (15 U.S.C. §§ 78m(d), (e) and 78n(d)–(f)), commonly referred to as the Williams Act, which Congress adopted in 1968 to regulate transfers of control of publicly traded corporations for the purpose of protecting investors. *Piper v. Chris–Craft Industries Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). The

---

lation of transfers of control of publicly traded corporations. (Cmpl. ¶¶ 36–42) Count III alleges that the State of Wisconsin is only minimally affected by Alleghany's purchase of ST. PAUL shares, and that its attempt to regulate the out-of-state transactions in ST. PAUL shares violates the Due Process Clause of the Fourteenth Amendment. Finally, Count IV charges that the foregoing allegations constitute a violation of 42 U.S.C. § 1983.

**10.** 15 U.S.C. § 1011 states:

Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1012 states, in pertinent part:

(a) The business of insurance, and every person engaged therein, shall be subject to the

laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business *unless such Act specifically relates to the business of insurance* .... [emphasis added]

In 15 U.S.C. § 1014 the business of insurance is expressly made subject to the National Labor Relations Act and the Fair Labor Standards Act of 1938 and the Merchant Marine Act.

**11.** See note 3, *supra.* Some of the history of the Model Insurance Holding Company System Regulatory Act is recounted in the decision of the Minnesota Administrative Law Judge, who notes that the Minnesota statute was drawn from the model act. (Cmpl.Ex. A, pp. 23–25)

**12.** See Finding 15, *supra* p. 1523.

thrust of Alleghany's claim is that it has done all that the Williams Act requires of it and that Alleghany's market purchases of 10%, 20% or more of ST. PAUL's shares would be lawful and proper in all respects. As the Wisconsin legislation permits the Commissioner to bar further purchases (as he has done here), or otherwise impair or impede the acquisition process, it is in direct conflict, Alleghany argues, with the letter and the purpose of the federal legislation and must be seen as having been preempted by it.

The question of a state's supervisory powers with respect to corporate takeovers generally is one of considerable consequence, and has been visited, with mixed results, at least three times by the Supreme Court in the past few years. *Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (involving Idaho takeover legislation—decided on venue grounds); *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion voiding Illinois legislation) and *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (upholding Indiana legislation).[13] These same cases also presented Alleghany's other principal claim—that state attempts to regulate corporate takeovers violate the Commerce Clause.

Defendant does not dispute the existence of substantial federal constitutional questions or the jurisdiction of this court to consider them. He urges, however, that theories of abstention fashioned by the Supreme Court are controlling and dictate the dismissal of Alleghany's complaint. For purposes of this motion, the well-pleaded, factual allegations of the complaint are taken as true. *Fore Way Exp., Inc. v. Wis. Dept. of Industry*, 660 F.Supp. 310, 311 (E.D.Wis.1987).

Our Court of Appeals has recently described "abstention" as

> the rubric applied to a congeries of statutory and judicially created doctrines which either require or intimate (more or less strongly) that a federal court not entertain a claim pressed before it. All of these doctrines are designed to afford state courts and other organs of state government a measure of respect. A few also reflect the judicial preference for avoiding unnecessary questions of constitutional law. Although the rationales differ in detail, the application of each doctrine results in the federal court declining to hear a claim, either until the state court has an opportunity to address it, *e.g.*, [*Railroad Commission of Texas v.*] *Pullman* [*Co.*] 312 U.S. [496] at 501–02, 61 S.Ct. [643] at 645–46 [85 L.Ed. 971 (1941)], or absolutely, *e.g.*, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

*Moses v. Kenosha County*, 826 F.2d 708, 709 (7th Cir.1987). This unitary view of the subject, which deemphasizes the separateness of the various "doctrines", echoes the admonition of the Supreme Court in its most recent treatment of the question:

> The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes.

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 1526 n. 9, 95 L.Ed.2d 1 (1987).[14]

It is with these considerations in mind that I turn to defendant's specific claims that abstention is proper under either the *Younger* or *Burford* abstention doctrines. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Burford v. Sun*

---

**13.** The statutes in *Leroy* and *Edgar* pertained only to takeovers by tender offer. 443 U.S. at 176, n. 4, 99 S.Ct. at 2712, n. 4; 457 U.S. at 626, n. 1, 102 S.Ct. at 2632, n. 1. The Indiana statute in *CTS Corp.* was addressed broadly to the acquisition of "control shares" in corporations incorporated in Indiana, 107 S.Ct. at 1641. None

of the cases involved control of an insurance company.

**14.** The historical development of abstention is helpfully summarized in 17A Wright, Miller and Cooper, *Federal Practice and Procedure: Jurisdiction 2d* (1988) § 4241.

*Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

## I. *The Younger Doctrine*

In 1971, the Supreme Court held, in *Younger v. Harris*, that it was inappropriate for a federal judge to enjoin a pending state criminal prosecution. Over the next sixteen years that rationale has been extended to non-criminal, state administrative proceedings (see *e.g. Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) and *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)) and, in 1987, to litigation between purely private litigants. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).[15]

In the *Pennzoil* case, Pennzoil had obtained an $11 billion judgment against Texaco in the Texas state trial court. Under Texas law, a bond of $13 billion was required as a condition of appeal. Texaco did not appeal, nor did it attempt to challenge the constitutionality of the appeal bond law in the Texas courts. Instead, it filed an action (after the jury verdict and just hours before judgment was entered) in the federal district court for the Southern District of New York to enjoin Pennzoil from enforcing the judgment, alleging violation of its rights under the Constitution and federal laws.[16] The district court granted a preliminary injunction (626 F.Supp. 250 (1986)) and the Second Circuit, affirming, made it permanent. (784 F.2d 1133 (1986)).

In reversing, the Supreme Court reaffirmed the principles upon which *Younger* was grounded, and added that abstention is obligatory under *Younger* whenever important state interests are at stake.

The first ground for the *Younger* decision was "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should

not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law." *Id.* [401 U.S.] at 43, 91 S.Ct. at 750. The Court also offered a second explanation for its decision:

"This underlying reason ... is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.... The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* at 44, 91 S.Ct. at 750.

*This concern mandates application of* Younger *abstention not only when the pending state proceedings are criminal, but also when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the states and the National Government.* [citations omitted] [emphasis added]

---

**15.** For the evolution and application of the *Younger* rule generally, see 17 A Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d* (1988), §§ 4251–4255.

**16.** These included the Full Faith and Credit Clause, the Commerce Clause, the Williams Act, the Securities Exchange Act of 1934, the Due Process Clause and Equal Protection Clauses of the Fourteenth Amendment, and 42 U.S.C. § 1983. *Id.* 107 S.Ct. at 1523, n. 6 and 1524.

*Pennzoil Co. v. Texaco, Inc.*, 107 S.Ct. at 1525–26.[17]

Chief Justice Burger advanced a convenient three-part test for determining the applicability of *Younger* abstention in the *Middlesex County* case:

> *first,* do state bar disciplinary hearings within the constitutionally prescribed jurisdiction of the State Supreme Court constitute an ongoing state judicial proceeding; *second,* do the proceedings implicate important state interests; and *third,* is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Id.* 457 U.S. at 432, 102 S.Ct. at 2521. See also *Texaco, Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1149 (2d Cir.1986); *New Orleans Public Service v. City of New Orleans*, 798 F.2d 858, 863–864 (5th Cir.1986), *cert. denied* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed. 2d 515 (1987); *World Famous Drinking Emporium v. City of Tempe*, 820 F.2d 1079, 1082 (9th Cir.1987). These same factors provide the framework for the *Younger* analysis in the instant case.

The first question to consider is whether the hearing provided for under Wis.Stats. § 611.72(3) and conducted by the Commissioner was part of an ongoing state judicial proceeding.

That a state administrative proceeding may be a part of an ongoing judicial proceeding is central to the Supreme Court's decisions in *Ohio Civil Rights Commission v. Dayton Christian Schools*, 106 S.Ct. at 2723–2724 and n. 2, and *Middlesex County*, 457 U.S. at 433–434, 102 S.Ct. at 2522. The proceeding must, however, be adjudicative or judicial in nature to warrant deference under the *Younger* principle. *Ohio Civ. Rights Comm.*, 106 S.Ct. at 2723, n. 2. As Judge Easterbrook recently observed:

> *Younger* and many ensuing cases protect the state's processes from premature federal interference. *A state is entitled to continue in its own courts (or administrative tribunals, for there is no sharp distinction between a state "court" and a state "adjudicatory agency")* litigation begun there, without having the suit under § 1983 serve as a form of federal-defense removal.... If the state's tribunal is competent to resolve the federal defense, then the litigation *must continue* in that forum.

*Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 528 (7th Cir.1988). [emphasis added]

Although the Supreme Court has not spelled out all that is required to render a proceeding judicial in nature,[18] it may be assumed that those proceedings which provide the type of procedural safeguards

**17.** Alleghany opens its argument (Br. p. 5; Dkt. # 7) with Justice Brennan's oftquoted observation from *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) regarding "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." Whatever vitality that statement may continue to have with regard to the quite different species of abstention brought to life in that case, it has been without force in the *Younger* context for some time. To the contrary

> *Younger v. Harris, supra,* and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances.

*Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. at 431, 102 S.Ct. at 2520; see also *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601, 95 S.Ct. 1200, 1206, 43 L.Ed.2d 482 (1975). Indeed, Justice Brennan has made no secret of his disagreement with the expansion of *Younger* abstention. The latest expression is found in his opinion concurring

in the judgment in *Pennzoil*, in which he reiterates his view that *Younger* is generally inapplicable to civil proceedings and, particularly, actions under 42 U.S.C. § 1983. *Pennzoil*, 107 S.Ct. at 1530.

It should be noted that the *Younger* decision itself acknowledged that abstention would be inappropriate in the case of a statute which was in patent and flagrant violation of constitutional prohibitions in every conceivable application or upon a showing of bad faith, harrassment or other unusual circumstances. *Younger*, 401 U.S. at 53–54, 91 S.Ct. at 754–55. It has not been suggested that any of these exceptional circumstances are present here. Thus, Alleghany's suggestion that the *Younger* abstention is "extraordinary and narrow," must be viewed as somewhat overstated. (Br. p. 5)

**18.** The Court of Appeals in *Middlesex County* thought that the Ethics Committee procedures fell short of being adjudicative in nature (643 F.2d 119, 128 (3rd Cir.1981)) but those reservations were rejected by the Supreme Court without discussion.

found in formal court proceedings will satisfy the requirement.[19] I find that the provisions of Ch. 227 Wis.Stats. and the Commission's Rules of Procedures for Hearings (s. Ins. 5.01–5.25, Wis.Adm.Code) regarding the conduct of hearings provide for rules and procedures substantially the same as those followed in formal court proceedings, and Alleghany has not suggested otherwise. Wis.Stats. § 601.62(2)[20]

The Wisconsin Administrative Procedure Act also provides for a rehearing upon timely petition, Wis.Stats. § 227.49, and under § 227.53, judicial review of the Commissioner's decision is available in the Circuit Court of Dane County upon the filing of a petition within thirty days of service of the decision. Further review can also be had in the state appellate courts. Wis. Stats. § 227.58. The Commissioner's decision specifically noted Alleghany's right to such a rehearing or judicial review. (Compl. Ex. C, pp. 22–23) Alleghany acknowledges that it "chose to proceed to federal court" on its constitutional claims rather than seeking a review in the state courts. (Br. p. 4)

It appearing that the hearing before the Commissioner was judicial in nature and was part of an ongoing state judicial proceeding, it is appropriate to consider next the third *Middlesex County* factor: whether the state proceedings afforded Alleghany an adequate opportunity to raise its federal claims. Alleghany has not questioned the adequacy of Wisconsin's review procedures to consider the constitutional and federal law issues raised by it, so this issue may be disposed of in summary fashion. Wis.Stat. § 227.57 sets forth the scope and standards of review. It states, in pertinent part:

(5) The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

(6) If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

.    .    .    .    .

(8) The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; *or is otherwise in violation of a constitutional or statutory provision;* but the court shall not substitute its judgment for that of the agency on an issue of discretion. [emphasis added]

.    .    .    .

(10) Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. *The right of the appellant to challenge the constitutionality of any act or of its application to the appellant shall not be foreclosed* or impaired by the fact that the appellant has applied for or holds a license, permit or privilege under such act. [emphasis added]

It is clear from these sections that plaintiff had the right, upon state court review, to

---

**19.** See *Restatement (Second) of Judgments* (1982) § 83(2) and Comment (b) and (c), pertaining to the essential elements of adjudication (as found in the Federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* and the Model State Administrative Procedure Act) for purposes of affording preclusive effect to administrative determinations.

**20.** Wisconsin has adopted the Model State Administrative Procedure Act. See note and table before 26 Wis.Stats.Anno. (1988 Supp.) § 227.01.

have all the federal defenses raised in the instant case heard and determined in a competent state tribunal. That is all that *Younger* requires. *Ohio Civil Rights Commission*, 106 S.Ct. at 2724.

■ Alleghany argues, however, that there was no "pending" judicial proceeding to be disrupted here as the Commissioner had entered his final determination. This contention does not bear scrutiny. The entire premise of *Younger* abstention is that ongoing state proceedings may not be subjected to federal interference, and it is disingenuous to suggest that a party can avoid the operation of the rule by the simple expedient of refusing to follow the state adjudicatory process to its conclusion. This is the inescapable teaching of *Huffman v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) where the federal plaintiff, having lost in the state trial court, abandoned its state appellate remedies and attempted to litigate its constitutional defenses in the federal court. *Id.* at 598, 95 S.Ct. at 1205.[21] In dismissing the federal complaint, the court (by Justice Rehnquist) held it of no consequence that the trial court judgment may have become final and nonappealable:

> For regardless of when the Court of Common Pleas' judgment became final, we believe that a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court, unless he can bring himself within one of the exceptions specified in *Younger*.
>
> Virtually all of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial. Intervention at the later stage is if anything more highly duplicative, since an entire trial has already taken place, and it is also a

direct aspersion on the capabilities and good faith of state appellate courts. Nor, in these state-initiated nuisance proceedings, is federal intervention at the appellate stage any the less a disruption of the State's efforts to protect interests which it deems important. Indeed, it is likely to be even more disruptive and offensive because the State has already won a *nisi prius* determination that its valid policies are being violated in a fashion which justifies judicial abatement.

*Id.* 420 U.S. at 608–609, 95 S.Ct. at 1210–11. See also *World Famous Drinking Emporium, Inc. v. City of Tempe*, 820 F.2d 1079.

The foregoing considerations apply with the same force to the interruption of state adjudicative processes that begin with administrative adjudications.[22] That an administrative proceeding and the subsequent state court review is to be seen as an adjudicative continuum for abstention purposes is corroborated by the rule that an adequate opportunity to raise constitutional challenges to an administrative proceeding (the third *Middlesex County* factor) will be found to exist even though that opportunity first became available upon review at the state court level. *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. at 436, 102 S.Ct. at 2523.

> In any event, it is sufficient under *Middlesex, supra*, 457 U.S. at 436, 102 S.Ct. at 2523, that constitutional claims may be raised in state court judicial review of the administrative proceeding.

*Ohio Civ. Rights Com'n v. Dayton Christian Schools*, 106 S.Ct. at 2724; *New Orleans Public Service v. City of New Orleans*, 798 F.2d 858, 864 (5th Cir.1986), *cert. denied*, 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987); *Fore Way Exp. Inc. v. Wis. Dept. of Industry*, 660 F.Supp. 310, 312–313 (E.D.Wis.1987).

---

**21.** Actually, the Commissioner's order had not become final when Alleghany filed its federal complaint, as the thirty-day period for filing an appeal under Wis.Stat. § 227.53 had not expired. In this respect Alleghany appears to be in the same posture as the plaintiff in *Huffman* which also still had the option to appeal at the

time the federal court action was filed. *Id.* at 611, n. 22, 95 S.Ct. at 1211, n. 22.

**22.** This conclusion was anticipated in *Metropolitan Life v. Board of Directors*, 572 F.Supp. 460, 468 (W.D.Wis.1983).

Alleghany places great reliance, in this regard, upon the Fifth Circuit's decision in *Thomas v. Texas State Bd. of Medical Examiners*, 807 F.2d 453 (5th Cir.1987). There the Medical Board had revoked plaintiff's license after a hearing. He initiated a review in the state court, but later dismissed it. He then brought an action under 42 U.S.C. § 1983 in federal court against the Board and the individual members seeking reinstatement of his license, declaratory relief and damages. He alleged a continuing vendetta against him, procedural due process claims, and various constitutional violations including the unconstitutionality of certain state statutes. The district court abstained, noting plaintiff's failure to pursue his state court remedies. The court of appeals reversed, stating:

> Because no state action was pending and exhaustion of state remedies is not required as a prerequisite to § 1983 cases, abstention under the principles of *Younger v. Harris*, [footnote omitted] as extended, was not appropriate. We therefore, reverse and remand.

*Thomas*, 807 F.2d at 454.

While *Thomas* does support Alleghany's position in some respects, I do not find it persuasive.[23] To the extent that it is based on the notion that the *Younger* standards may be avoided by simply dismissing the appeal or allowing the appeal time to expire, or that separate exhaustion requirements exist for state court adjudications and administrative adjudications, I believe it is contrary to the authorities discussed above and in *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 528 (*supra*, pp. 1527–28).

To the extent *Thomas* is based on the view that exhaustion of state remedies for *Younger* purposes is not required in cases under 42 U.S.C. § 1983, it appears to be contrary to other authorities. *Huffman, Ohio Civil Rights Commission*, and *Pennzoil* all involved § 1983 claims, and in each case *Younger* abstention was invoked and the plaintiffs were left to pursue their constitutional remedies in the state forums.[24] The *Younger* exhaustion requirement is a function "of the deference to be accorded state proceedings *which have already been initiated* and which afford a competent tribunal for the resolution of federal issues." *Huffman*, 420 U.S. at 609–610, n. 21, 95 S.Ct. at 1210–11, n. 21 (emphasis added). *Monroe v. Pape*, 365 U.S. 167 (1961) and *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), on the other hand, stand for the quite different proposition that one need not, as a general requirement, initiate state court proceedings or pursue state administrative remedies as a precondition to beginning a § 1983 action in the federal court. See *Jordi v. Sauk Prairie School Bd.*, 651 F.Supp. 1566, 1578 (W.D.Wis.1987); *Metropolitan Life v. Board of Directors*, 572 F.Supp. 460, 473 (W.D.Wis.1983); dissenting opinion of Justice Rehnquist in *City of Columbus v. Leonard*, 443 U.S. 905, 907–910, 99 S.Ct. 3097, 3098–3100, 61 L.Ed.2d 872 (1979). For all the above reasons, I decline to follow the holding in *Thomas*.

Alleghany also contends that it cannot be required to seek state court review of the Commissioner's administrative order on the authority of a footnote in *Huffman*, 420 U.S. at 610, n. 21, 95 S.Ct. at 1211, n. 21, which reads, in pertinent part:

> (4) the charge of a personal vendetta by the board is not unlike the charge of bias in *Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973), which was found to render *Younger* abstention inappropriate.

---

**23.** The case is distinguishable on a number of grounds: (1) *Younger* abstention does not apply to actions for damages under 42 U.S.C. § 1983, *Deakins v. Monaghan*, 484 U.S. 193, 108 S.Ct. 523, 531–532, 98 L.Ed.2d 529 (White, J. concurring) (1988), and it is unlikely that the damage claims would have been included in the state review proceedings; (2) relief was sought from the individual board members who would not have been parties to the review proceedings in that capacity; (3) there are no findings of fact from which the adjudicative nature of the administrative proceeding can be determined; and

**24.** This evoked a strong dissent by Justice Brennan in *Huffman*, 420 U.S. at 613–618, 95 S.Ct. at 1212–15,—a view which he again expressed in his concurring opinion in *Pennzoil*, 107 S.Ct. at 1530.

Our exhaustion requirement is likewise not inconsistent with such cases as *City Bank Farmers' Trust Co. v. Schnader,* 291 U.S. 24 [54 S.Ct. 259, 78 L.Ed. 628] (1934), and *Bacon v. Rutland R. Co.,* 232 U.S. 134 [34 S.Ct. 283, 58 L.Ed. 538] (1914), which expressed the doctrine that a federal equity plaintiff challenging state administrative action need not have exhausted his state judicial remedies. Those cases did not deal with situations in which the state judicial process had been initiated.

A careful reading of the quoted language in its context reveals that the court is merely preserving the distinction between the separate exhaustion doctrine represented by the *Bacon* and *City Bank* cases and the exhaustion requirement in *Younger* cases. The same point had been made earlier in *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

> Normally when a State has instituted administrative proceedings against an individual who then seeks an injunction in federal court, the exhaustion doctrine would require the court to delay action until the administrative phase of the state proceedings is terminated, at least where coverage or liability is contested and administrative expertise, discretion, or factfinding is involved.[13]

[13] This exhaustion requirement does not apply generally to state "judicial," as opposed to "administrative," remedies. See *Bacon v. Rutland R. Co.,* 232 U.S. 134 [34 S.Ct. 283, 58 L.Ed. 538] (1914); *City Bank Farmers Trust Co. v. Schnader,* 291 U.S. 24 [54 S.Ct. 259, 78 L.Ed. 628] (1934). *The doctrine of exhaustion of administrative remedies should, however, be kept distinct from other equitable doctrines such as those exemplified in Younger v. Harris, 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971), and Railroad Comm'n v. Pullman Co., 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971] (1941), which do require a federal court to defer in appropriate circumstances to state judicial proceedings.* [emphasis added]

*Id.* 411 U.S. at 574, 93 S.Ct. at 1695. Subsequent to the decisions in *Gibson* and *Huffman,* the Supreme Court, as discussed above, extended the *Younger* doctrine to state administrative proceedings, and the references in the quoted portions of the *Gibson* and *Huffman* footnotes to "state *judicial* proceedings" and "state *judicial* process" must now be read more broadly to include all state adjudicatory proceedings which satisfy the other requirements of *Younger.*[25] This conclusion also finds support in the Seventh Circuit's recent observation that court proceedings and administrative proceedings are on equal footing for purposes of *Younger* abstention. *Bethune Plaza, Inc. v. Lumpkin,* 863 F.2d at 528 (*supra,* pp. 1527–28).

The burden of proof was on Alleghany to show that it was unable to present its constitutional claims in related state court proceedings, *Pennzoil,* 107 S.Ct. at 1528; *Horn v. City of Chicago,* 860 F.2d 700, 702, n. 5 (7th Cir.1988) and it makes no pretense of meeting that burden. It must therefore be assumed that the state procedures would have provided an adequate remedy. *Id.*

Finally, Alleghany suggests that since the time for state court review has expired, defendant's motion would deprive it of a remedy in any court if the motion to dismiss were granted. (Br. p. 4) But that is only the natural consequence of Alleghany's decision not to proceed. The same argument has been advanced and rejected without sympathy in other cases.

> While appellee had the option to appeal in state courts at the time it filed this action, we do not know for certain whether such remedy remained available at the time the District Court issued its permanent injunction, or whether it remains available now. *In any event, appellee may not avoid the standards of Younger by simply failing to comply with the procedures of perfecting its appeal* within the Ohio judicial system. [emphasis added]

*Huffman,* 420 U.S. at 611, n. 22, 95 S.Ct. at 1211, n. 22. *Pennzoil,* 107 S.Ct. at 1529, n. 16; *Horn,* 860 F.2d at 702, n. 5 ("That relief may no longer be available to plain-

**25.** Neither the *Middlesex County* case nor the *Ohio Civil Rights Commission* case (written by Justice Rehnquist) refers to the quoted portion of the *Huffman* footnote—an unlikely omission if the court intended to maintain a separate rule on exhaustion for administrative proceedings.

tiffs in the state courts would not absolve them of a failure to assert state remedies in a timely manner.")

I conclude that the Commissioner's hearing was (1) of a judicial nature, (2) was a part of an ongoing judicial proceeding which afforded full opportunity for the presentation of plaintiff's constitutional claims, and (3) that plaintiff knowingly failed to pursue its state remedies in a timely manner. Thus, the first and third of the *Middlesex County* tests have been met.

The remaining *Middlesex* factor is whether the state proceedings involve important state interests. This factor is, of course, a most critical one in the *Younger* analysis. It is evident from the many cases in which *Younger* abstention has been applied that the interests recognized are extremely wide-ranging, and, as *Pennzoil* establishes, the state itself need not be a party for the doctrine to apply.[26] Contrary to the implication of plaintiff's argument, the recognition of, and deference to, the state's adjudication of those interests does not diminish or denigrate in any way the importance of the federal interests which the federal plaintiff seeks to vindicate.[27] As Justice Black wrote:

> What the concept [of federalism] does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government,

anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. *Younger,* 401 U.S. at 44, 91 S.Ct. at 750. The premise is not that the federal interests will go unprotected, but rather that the state adjudicatory systems are equally competent to protect those interests (and will do so faithfully) and better suited to construe and apply state laws to effectuate state policies. See *Pennzoil,* 107 S.Ct. at 1529; *Huffman,* 420 U.S. at 602, 611, 95 S.Ct. at 1207, 1211.

Justice Powell pointed out in *Pennzoil,* that abstention in these circumstances has the further advantage of "avoid[ing] unwarranted determination of federal constitutional questions," and especially those based upon non-binding federal interpretations of state statutes. *Pennzoil,* 107 S.Ct. at 1526. That, of course, touches the concern of the *Pullman* abstention doctrine, but the Court noted that the same considerations are relevant to *Younger* abstention. *Pennzoil,* 107 S.Ct. at 1526, n. 9.[28] This factor deserves consideration in the instant case, as it does not appear that the Wisconsin appellate courts have ever had occasion to construe the legislation in issue. (Defendant represents that this is the first contested acquisition under the Act. (Rep.Br. p. 18, Dkt. # 20)) As in *Pennzoil,*

**26.** See *e.g., Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (civil nuisances); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (welfare fraud); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (child custody); *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (bar discipline); *Ohio Civil Rights Comm. v. Dayton Christian Schools,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (employment discrimination); *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed. 2d 1 (1987) (judicial procedures); *World Famous Drinking Emporium v. City of Tempe,* 820 F.2d 1079 (9th Cir.1987) (zoning); *New Orleans Public Service, Inc. v. City of New Orleans,* 798 F.2d 858, *cert. denied* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987) (utility rate requests). See, also, cases collected in Wright, Miller & Cooper, *supra,* § 4254 at n. 44 (parking fines, civil contempt, surgical procedures, physician discipline, kosher meat sales, and truancy).

**27.** If the rule were otherwise, it would be necessary to resolve the substantive federal claims before deciding whether to return them to the state for resolution.

**28.** *Pullman* abstention (*Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)) has been defined as applying "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *Colorado River Water Cons. Dist.,* 424 U.S. at 814, 96 S.Ct. at 1244, quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959) Unlike *Younger* abstention, *Pullman* abstention does not depend on the existence of related state proceedings and the federal court retains jurisdiction. *Pennzoil* 107 S.Ct. at 1526, n. 9; *Moses v. Kenosha County,* 826 F.2d 708, 709–710 (7th Cir.1987).

Alleghany's failure to present its claims to the Wisconsin courts has made it impossible to know whether, or to what extent, a conflict between state and federal law actually exists. Thus, as in *Pennzoil, Younger* abstention

"offers the opportunity for narrowing constructions that might obviate the constitutional problem and intelligently mediate federal constitutional concerns and state interests." *Moore v. Sims* [442 U.S. 415, 429–430, 99 S.Ct. 2371, 2380–81, 60 L.Ed.2d 994 (1979)].

*Pennzoil,* 107 S.Ct. at 1526–1527.

The state interest implicated by these proceedings is, of course, the regulation of the insurance industry. As noted earlier, Congress has specifically yielded the regulation of "the business of insurance and every person engaged therein" to the individual states. 15 U.S.C. § 1011 and 1012. See *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 429, 66 S.Ct. 1142, 1154, 90 L.Ed. 1342 (1946). In Wis.Stats. § 600.01 *et seq.* Wisconsin has undertaken that regulatory burden, and has invested in the defendant Commissioner the responsibility to carry it out. Wis.Stats. § 601.41. In furtherance of that responsibility, the Commissioner has also adopted extensive regulations. See 10 Wis.Adm.Code, Rules of Commissioner of Insurance.

That the subject of insurance and its regulation is a matter of vital state interest can hardly be disputed. Indeed, that interest has been recognized in the abstention context on numerous occasions. *Grimes v. Crown Life Ins. Co.,* 857 F.2d 699, 703 (10th Cir.1988); *Levy v. Lewis,* 635 F.2d 960, 964 (2d Cir.1980); *Metropolitan Life Ins. v. Board of Directors,* 572 F.Supp. 460, 468–469, 473 (W.D.Wis.1983). See also, *Matter of Cash Currency Exchange, Inc.,* 762 F.2d 542, 556 (7th Cir.1985), *cert.*

*denied,* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

I also subscribe to the view expressed by Judge Urbom in the Nebraska litigation that the state proceedings involving the approval of transfers of control engage important state concerns.

Nebraska obviously has an interest in the status of competition in insurance in Nebraska, the financial condition of anyone acquiring an insurance company incorporated in Nebraska, the plans and proposals for operation of the corporation, the competence of those who would be responsible for the operation of the Nebraska corporation, and the interests in general of policyholders of the Nebraska corporation. Those are important state interests.

*Alleghany Corp. v. McCartney,* No. CV–88–L–235, 1988 WL 156189 (D.Neb. Oct. 18, 1988) slip op. at 4 (Dkt. # 47)[29]

Without intending to express a view as to the merits of Alleghany's constitutional claims (or the related issue of whether the subject legislation constitutes the regulation of "the business of insurance" for purposes of the McCarran–Ferguson Act), the factors the Commissioner is required to take into account in ruling upon a request to acquire control shares under Wis.Stats. § 611.72 essentially parallel the legislation or regulations with respect to the formation or operation of domestic companies, or the admission of non-domestic insurers.[30] The authority of the state to determine who shall have a license to write insurance in the state seems fundamental to this regulatory power. See Wis.Stats. §§ 610.01, 611.02, 618.01, .11. It is not surprising, then, that the subsidiary's eligibility for the issuance of a license after the transfer of control is the first factor to be considered

---

**29.** Judge Urbom granted the motion to dismiss in *McCarthy* on *Younger* grounds. The motion was denied in the North Dakota case both as to *Younger* and *Burford. Alleghany Corp. v. Pomeroy,* 698 F.Supp. 809 (D.N.D.1988) (Dkt. # 35). The reasons advanced in Judge Conmy's opinion are all considered in this Recommendation and will not be addressed separately. There was one major point of distinction, however. Substantial reliance was placed on the fact that

constitutional challenges *could not* be raised on judicial review of the Commissioner's decision under the North Dakota statutes. Thus, the third *Middlesex* factor was not present. At 812–13.

**30.** See *e.g.* Wis.Stats §§ 610.001–.21; 611.-10, .13, .19, .20, .54; 618.11, .12, .21; s. INS 12.01(11)(15) Wis.Adm.Code.

by the Commissioner under § 611.72(3). Closely related to that factor is that pertaining to the competence and integrity of the persons who will be in control after the transfer (§ 611.72(3)(e)). Insurance companies receive large sums of money from the public in exchange for the companies' promise to fulfill the insurance contract when the risk insured against occurs. Most of the funds a company holds are earmarked for the discharge of those obligations to the policyholders.[31] It seems elementary that the regulatory authorities will wish to assure themselves that the stewards of those funds are not only trustworthy but are also informed and prudent managers. Thus, the Insurance Code has long required background information with regard to any changes of principal management personnel and permitted the Commissioner to remove anyone deemed unsuitable from a position of influence. Wis.Stats. § 611.54(1), (3).

Two other, closely-related, factors bear on what may be the Commissioners' most important reponsibility—to see to the financial solvency of insurance companies under his jurisdiction. Whether a company writing insurance in Wisconsin is incorporated here or elsewhere, its insolvency has the same effect on the policyholders within the state. Thus, the statute requires the Commissioner also to consider the acquiring persons' plans for consolidation, liquidation or other material changes in business or corporate structure or management of the Wisconsin subsidiary or the parent company, as consistent with the Commissioner's obligation to see to the protection of the policyholders as well as the interest of the public in the integrity of its financial institutions. (Wis.Stat. § 611.72(3)(d)) The Commissioner's consideration, under subsection (3)(c), of the financial condition of the acquiring party, and the attendant risk of the impairment of the financial stability of the parent or its domestic subsidiary, appear also directly to engage the state's legitimate regulatory concern. It is, I think, common knowledge that the assets of insurance companies are, in the main, highly liquid—a condition which would make their assets vulnerable if an acquiring party were unable to make ends meet or wanted to use the insurance company assets for non-insurance purposes. This concern is reflected in other legislation regulating insurance holding companies and intercorporate transactions among affiliates "that may affect the solidity of insurers authorized to do business in this state or otherwise be detrimental to protected interests." Wis.Stat. §§ 617.-01(2), .21–.23.

Finally, the statute (§ 611.72(3)(b)) permits the Commissioner to consider the competitive effect of the acquisition. In this he again exercises an authority which has also been conferred upon him with respect to other insurance matters. Wis.Stats. § 601.01(3).

I see no need to prolong this discussion unnecessarily. While Alleghany denies the existence of any important state interest or questions of state policy, it makes no attempt to demonstrate that the factors to be taken into account by the Commissioner are unrelated to legitimate regulatory concerns. The express concern of this legislation for the protection of the solvency of domestic insurance companies and foreign insurance companies licensed to write insurance in Wisconsin and for their Wisconsin policyholders is at least of equal importance as the state's interests in the liquidation of insurance companies which led the courts to abstain in *Grimes*, 857 F.2d at 703; *Levy*, 635 F.2d at 964 and *Metropolitan Life*, 572 F.Supp. at 469, 473.

All of the elements requisite to *Younger* abstention as spelled out in *Middlesex County* are present here, and abstention is therefore mandated. *Pennzoil*, 107 S.Ct. at 1526. To hold otherwise would render the doctrine a virtual nullity, and would also require this court to construe important state regulation which has never been subjected to appellate scrutiny by the Wisconsin courts. This not only invites the

---

**31.** Or on behalf of the policyholders, in the case of liability insurance, to discharge their obligations to injured third parties.

expenditure of substantial federal judicial energy in the production of what would likely be a meaningless, advisory opinion (*Pennzoil*, 107 S.Ct. at 1526), but would also repudiate the central thesis of the *Younger* doctrine by supplanting the prerogative of the state to construe, in ongoing proceedings, its own legislation in such a way as to reconcile its important policies with the federal constitution and statutes.

Alleghany has offered a number of other arguments in opposition to the motion. I have considered these contentions and find them to be without merit. A summary discussion of the principal points follows.

Alleghany argues that *Younger* does not apply (1) because the state did not initiate the administrative proceeding, (2) it was not a state enforcement proceeding, and (3) Alleghany has not violated the state law. (Br. pp. 14–24) It will be observed at the outset that the three-fold *Middlesex County* test contains no reference to any of the points. All that it requires (and its authority stands undiminished) is an ongoing state judicial proceeding implicating important state interests which affords an adequate opportunity to raise constitutional questions. *Id.*, 457 U.S. at 432, 102 S.Ct. at 2521. This attempt to promote factual characteristics and descriptive language from other cases to the level of predicate elements would simply add more "pigeonholes" to abstention theory and "trivialize the principles of comity and federalism" which underlie the abstention doctrine. *Middlesex County*, 457 U.S. at 437, 102 S.Ct. at 2524. The Supreme Court has developed this doctrine, and Alleghany has pointed to no language in any of its cases which would restrict its application to proceedings initiated by a particular party or for a particular purpose. Important state interests can be "implicated" in countless ways, in countless proceedings by all man-

ner of litigants. To impose such artificial conditions and restrictions upon the applicability of the rule would nullify its stated purpose of rendering "proper respect" to the states and their adjudicatory processes. *Younger v. Harris*, 401 U.S. at 44, 91 S.Ct. at 750. See also, *New Orleans Public Service*, 798 F.2d at 863, n. 2.[32] Whatever surface plausibility these contentions might otherwise have had, it is laid to rest by *Pennzoil*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), a case in which none of these factors were present. The state was not even a party, let alone the *initiator of enforcement* proceedings, and no *violation* of state law was claimed to have occurred. *Pennzoil* contradicts every point of Alleghany's thesis and no further discussion is required. See *Metropolitan Hospital v. Thornburgh*, 667 F.Supp. 208, 211 (E.D.Pa. 1987).

Alleghany next contends that abstention under the *Younger* doctrine is inappropriate because Alleghany seeks only prospective relief. It asserts that it does not seek to enjoin or annul defendant's order, but rather that it seeks only declaration that the legislation is invalid and injunctive relief to prevent the Commissioner from invoking or enforcing it in the future. (Cmplt. ¶¶ 50–51, I–III, Dkt. # 1)[33]

Alleghany sought approval to buy the ST. PAUL stock, and lengthy hearings followed. The Commissioner issued an order denying the application and it is presumably that order which he would seek to enforce should Alleghany purchase more stock. See Wis.Stats. §§ 601.41(4), 601.64. As we have seen, plaintiff had every opportunity to challenge the order and the statute under which it was issued in those proceedings. Instead, it voluntarily filed this complaint before its appeal time had even run. It is simply sophistry to say that

---

**32.** The instant case reveals the flaw in plaintiff's argument. The state's interest in insurance regulation is implicated equally whether presented in the context of a proceeding instituted by the Commissioner for a violation of the legislation or in the context of a hearing on a petition for advance approval. The disruption of federal intervention would also be felt equally in either case. It is difficult to credit as serious the

suggestion that an important state interest can never be implicated in the absence of a showing of a "violation" of law.

**33.** The *Younger* rule applies to requests for declaratory relief as well as injunctions. *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

the relief here is somehow different from the remedy Alleghany would have had under the state procedures. No matter how artfully worded its complaint may be, the obvious and intended effect of the present lawsuit is to prevent the Commissioner from enforcing his order. It is difficult to think of a clearer example of the sort of abuse that *Younger* was intended to prevent. See *Huffman,* 420 U.S. at 608–09, 95 S.Ct. at 1210–11.[34]

*Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) lends no support to Alleghany's position. There the federal plaintiff had been convicted three times in a five-week period for refusing to display the state's license plate motto which offended his religious principles and first amendment rights. He sought and obtained federal declaratory and injunctive relief against future prosecutions for the offense. The state claimed the federal court erred in hearing the case as plaintiff had not exhausted his appellate remedies in the earlier prosecutions. *Id.* at 709–711, 97 S.Ct. at 1432–34. The Supreme Court upheld the decision, finding that "exceptional circumstances" were present to justify the interference. As previously noted (*supra* n. 17) the *Younger* decision itself provided for such an exception to the rule, and the *Wooley* court found it in the successive prosecutions to which the plaintiff had been, and continued to be, exposed. *Wooley,* 430 U.S. at 712, 97 S.Ct. at 1234.[35]

The instant case is readily distinguishable from *Wooley.* Alleghany has made no claim that exceptional circumstances exist, and it could hardly do so.

The very nature of "extraordinary circumstances," of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. [footnote omitted] But whatever else is required, such circumstances must be "extraordinary" in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation.

*Kugler v. Helfant,* 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 (1975). Alleghany does not appear to face a threat of criminal prosecution at all, let alone a succession of them. At most it faces a risk of future civil enforcement proceedings if it should fail to obey the Commissioner's order. And since Alleghany is also apparently prevented from going forward with its purchases because of regulatory actions in other states, it can hardly claim a pressing need for immediate relief in this court.

Alleghany also argues that abstention is improper because it has alleged that Wisconsin exceeded its powers and authority in its enactment of the subject legislation and in its application of it to Alleghany. For this proposition it cites cases from a number of circuits which hold that abstention should not be invoked in preemption cases. See, *e.g., Southwestern Bell Telephone Co. v. Arkansas Public Service Comm.,* 824 F.2d 672, 673 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988) (citing cases). There is a contrary view represented by *New Orleans Public Service v. City of New Orleans,* 798 F.2d 858, 860–864 (5th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987) and *Aluminum Co. v. Utilities Comm. of State of N.C.,* 713 F.2d 1024, 1028–1030 (4th Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984).[36] The Seventh Circuit

---

**34.** Moreover, as Alleghany also challenges the constitutionality of the legislation *as applied* to it, some review of the proceedings before the Commissioner, and his decision, would appear unavoidable. (Compl. ¶¶ 31–35, 41, and 46.)

**35.** The court noted, by way of distinction, that the plaintiff had not asked to have the prior convictions annulled or expunged. (*Id.* at 711, 97 S.Ct. at 1434)

**36.** Without having made a study of it, it appears that the bulk of the cases on this point involve the regulation of electric (and other) utilities which are subject to regulation by both the state and federal authorities. See *New Orleans Public Service,* 798 F.2d at 860 and the discussion at 862, n. 1.

has not visited the question, nor has the Supreme Court.[37] However a statement by the Supreme Court, in a related context, supports the view that the mere fact of a preemption (or Commerce Clause) claim ought not foreclose the operation of the *Younger* rule. In *Ohio Civil Rights Commission* the court said:

> we have repeatedly rejected the argument that a constitutional attack on state procedures themselves "automatically vitiates the adequacy of those procedures for the purpose of the *Younger–Huffman* line of cases." [citation omitted]

106 S.Ct. at 2724. I can think of no sound reason why the naked assertion of a preemption claim should automatically override the considerations of comity underlying *Younger.*

The reasons for abstention here are even stronger than they were in *New Orleans Public Service.* The court acknowledged there that Congress had created a "bright line" dividing federal and state regulatory authority over electric rates, but abstained nevertheless, stating:

> Yet federal court intervention here may constitute a disruption of a *state* regulatory scheme, for *retail* rate making is clearly a field left to the jurisdiction of the states. [emphasis in original]

*Id.,* 798 F.2d at 860. In the instant case, the singular authority of the state to regulate insurance requires no further discussion, and it is equally clear that federal intervention may disrupt the state's well established regulatory scheme for determining who may engage in the business of insurance in Wisconsin and under what conditions.

Alleghany's argument requires the court to assume that the Wisconsin Act has been preempted by the Williams Act, but it has offered nothing by way of argument or authority on this motion to support that assumption. To the contrary, *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 1652, 95 L.Ed.2d 67 (1987) teaches that the Williams Act does not automatically foreclose states from adopting all legislation within the proper sphere of their historical authority just because the legislation may have a collateral (even deterrent) effect on attempts to take control of domestic corporations.

To reiterate, the purpose of the Williams Act is to protect investors in the context of transfers of corporate control. *CTS Corp.,* 107 S.Ct. at 1644. This is achieved through a market approach based upon full disclosure of all material information and strict regulatory neutrality. *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1276–1278 (5th Cir.1978) *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). The regulator must remain indifferent to the outcome of the contest or the relative merits of the contestants on their proposals.

The Wisconsin Act is not concerned about investors, but rather in preservation of the financial integrity of insurance corporations subject to Wisconsin's regulatory jurisdiction and the protection of the interests of Wisconsin policyholders. The Commissioner's responsibilities under the Act require him to make an evaluation of the suitability of the party seeking to take control, but he has no authority with regard to the fairness or reasonableness of any proposal to the shareholders of the target company.

The points of conflict in these regulatory schemes must be reconciled somewhere. The substantive claims of the parties are

---

**37.** But see *People of State of Illinois v. Kerr–McGee Chem. Corp.,* 677 F.2d 571, 577–578 (7th Cir.1982), which rejects, in another context, the underlying premise of Alleghany's argument:

> We do not agree, however, that a defendant can have a state law claim removed to federal court merely by uttering the word preemption. No such result has been authorized by statute nor has it been sanctioned by the Supreme Court.

> [w]e reaffirm our decision in *Bailey* and join at least two other circuits and a number of district courts in holding that the issue of federal preemption is merely a defense to state law claims. [footnote omitted] We can see no reason for treating a defense of federal preemption differently than any other defense based on federal law, and a defense to a state law claim cannot be a ground for removal.

not before me on this motion, and it is not my intent to do more here than pose the apparent positions of the parties. It is agreed, I think, that the Williams Act does not profess to concern itself with the regulation of insurance (nor has it been suggested that it "specifically relates to the business of insurance" so as to preclude state regulation under the McCarran–Ferguson Act). (15 U.S.C. § 1012) However, if, as Alleghany urges, the Williams Act is to be read as barring the legislation in issue, a serious gap may be created in this area of insurance regulation. To me, this militates against taking the issue out of the state adjudicatory process, and it is for that reason that I consider the holding in *New Orleans Public Service* to represent the better reasoned course. It is also the course recently adopted by Judge Gordon in an employment discrimination case in which the plaintiff, an interstate trucking company, contended that the provisions of the Wisconsin Fair Employment Act regarding handicapped persons had been preempted by a federal law which declared certain diabetics to be unqualified to drive motor vehicles. *Fore–Way Exp. Inc. v. Wis. Dept. of Industry,* 660 F.Supp. 310, 313 (E.D.Wis.1987). As here, that case also involved " 'a complex state regulatory scheme ... which would be disrupted by federal court review' " and "a state court system possessing expertise which is fully capable of addressing [plaintiff's] complaints." *Id.* at 313 citing *New Orleans Public Service,* 798 F.2d at 862, n. 1.[38]

For the foregoing reasons, I will recommend that the motion to dismiss be granted pursuant to *Younger v. Harris.*

II. *Burford Doctrine*

Defendant has also moved to dismiss under the abstention doctrine of *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In *Jordi v. Sauk Prairie School Bd.,* 651 F.Supp. 1566, 1578 (W.D.Wis.1987), this court observed that

*Burford* abstention "is appropriate only if federal review of a difficult question of state law would disrupt state efforts to establish a coherent policy respecting a matter whose importance transcends the result in the case under consideration." *Evans v. City of Chicago,* [689 F.2d 1286, 1295 (7th Cir.1982)] and *Metropolitan Life v. Board of Directors,* 572 F.Supp. 460, 473 (W.D.Wis. 1983).

In *Burford* a federal court challenge was mounted against the constitutionality of the procedure by which Texas regulated oil and gas production. The regulation of the oil and gas industry was a subject of great public importance, and required the maintenance of a uniform policy. The subject was very complicated and specialized knowledge was required for the administration of the system. The regulatory authority was vested in an administrative body with broad discretion, and its rulings were subject to a specialized judicial review. *Burford,* 319 U.S. at 319–327, 63 S.Ct. at 1100–04. Noting that "[d]elay,

---

**38.** Judge Gordon also found that the resolution of the preemption claim would have involved the federal court in detailed factfinding about matters within the traditional purview of the state. I am somewhat perplexed by the Commissioner's statement that factfinding would not be required in this case. (Rep.Br. p. 15, Dkt. #20) The statement appears to be based more upon the perceived shortcomings of Alleghany's arguments than a considered evaluation of the questions that would ultimately have to be decided. I would note initially that the Commissioner's order is premised on the authority of the McCarran–Ferguson Act which, in turn invites inquiry as to whether or not the Wisconsin Act pertains to the business of insurance. How that proposition can be established or negated without evidence, expert or otherwise, regarding the actual operation of insurance companies

and the nature, operation, and effect of the insurance regulatory measures involved is not at all clear. This very case points up the fact that the same regulatory actions may be open to a range of inferences. Thus, the legislation that Judge Urbom in Nebraska viewed as being in furtherance of an important state interest, *Alleghany Corp. v. McCartney,* No. CV–88–L–235, 1988 WL 156189 slip op. p. 4 (Dkt. #47) has been characterized by Judge Conmy in North Dakota as "purely economic protectionism of those currently in control of the insurance company." *Alleghany Corporation v. Pomeroy,* 700 F.Supp. 460, 467 (D.N.D.1988), slip op. at 16 (Dkt. #50) Contrary to the parties' views, I suggest that extensive factfinding may well be required to resolve the issues presented by the complaint.

misunderstanding of local law and needless federal conflict with the state policy" had attended previous federal intervention in these matters, the Supreme Court held that the federal courts should decline to exercise their jurisdiction. *Id.* at 327, 333–334, 63 S.Ct. at 1104, 1107–08.

The State provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. *Cf. Matthews v. Rodgers,* 284 U.S. 521 [52 S.Ct. 217, 76 L.Ed. 447 (1932)]. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

*Id.* 319 U.S. at 333–334, 63 S.Ct. at 1107–08. See *New Orleans Public Service,* 798 F.2d at 862.

No simple test has emerged for *Burford* abstention, *Metropolitan Life v. Board of Directors,* 572 F.Supp. 460, 472 (W.D.Wis. 1983), but a review of the relevant factors noted in the authorities leads me to conclude that it is applicable here. See *e.g. Jordi,* 651 F.Supp. at 1578–1580. The regulation of insurance, like the regulation of oil and gas production, is an exceedingly complex subject and specialized knowledge is required. The regulatory authority is, by statute, centralized in the office of the Commissioner of Insurance. See generally Wis.Stats. §§ 601.01, .41, .415, .61–.64.[39] Of particular significance in the *Burford* context is the formal, federal policy of non-interference with the state regulation of insurance as expressed in the McCarran–

Ferguson Act. See *Levy v. Lewis,* 635 F.2d 960, 963–64 (2d Cir.1980); *Matter of Cash Currency Exchange, Inc.,* 762 F.2d 542, 556 (7th Cir.), *cert. denied* 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985); *Grimes v. Crown Life Ins. Co.,* 857 F.2d 699, 703–704 (10th Cir.1988) citing *Metropolitan Life v. Board of Directors,* 572 F.Supp. at 472–473.

This action by Alleghany is a direct attack on an insurance regulatory policy adopted by the legislature and enforced by the Commissioner. *Jordi,* 651 F.Supp. at 1579. This policy, as previously discussed, has as its purpose the regulation of transfers of control of domestic insurance companies or the holding companies which control them.[40] This is not the place to discuss either the merits or constitutional validity of this policy. It is sufficient to note again that a relationship does exist between this specific policy and the general authority the Commissioner has and exercises over the licensing and supervision of insurance companies generally. What is even more important is that forty-seven other states have also identified this subject as one of regulatory concern and have adopted essentially the same legislation.

That this litigation would be disruptive of the state's efforts to maintain a consistent policy in this area requires little discussion. While this court unquestionably has the jurisdiction to rule on the constitutional challenges, it is not in a position to formulate state policy in this area no matter how valid and pressing the concerns of the Commissioner may be regarding the potential risks to the solvency of domestic insurance companies or the interests of Wisconsin policyholders. This Court's statement in *Metropolitan Life* has direct application here and sums up the justification for *Burford* abstension in this case.

[A] decision by this court of the state claims could impede efforts to implement the state policy expressed in Wis.Stats.

---

**39.** Unlike *Burford,* Wisconsin has not designated a particular trial court to review all of the Commissioner's determinations, but the state law does require a reviewing court to grant due weight to the special competence and discretion-

ary authority of administrative agencies. Wis. Stats. § 227.57(10). I do not consider the absence of this factor to be critical.

**40.** See discussion, *supra* pp. 1533–35.

§ 646.01(2)(a) and the very exercise of federal jurisdiction will interrupt the state's efforts to effect its policy respecting the liquidation and rehabilitation of Wisconsin insurance companies and the concomitant protection of policyholders. Indeed, the potential for conflict in the results of federal and state court adjudication could bring to a halt the state's efforts in this respect. It is a matter of substantial state concern that the process of liquidating an insurance company be carried out in an orderly and efficient manner, so as to protect the interests of the company's owners, policyholders, and creditors, as well as the public.

*Metropolitan Life v. Board of Directors,* 572 F.Supp. at 473. The state's interest in policies designed to prevent financial impairment of insurance companies and to protect the ongoing interests of policyholders, must be seen as at least as great as its interest in the procedures for the liquidation of companies which have failed.

It will therefore be recommended that plaintiff's complaint be dismissed on *Burford* grounds as well. 17A Wright, Miller and Cooper, *Federal Practice and Procedure, Jurisdiction, 2d* (1988) § 4245 at 101–102.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendant's motion to dismiss be GRANTED on each of the grounds stated.

ENTERED this 12th day of December, 1988.